## Richmond

C. A. Lucas, Et Al. v. Pembroke Water Company, Incorporated.

March 9, 1964.

Record No. 5692.

Present, All the Justices.

*Arthur F. Kingdon (Andrew L. Farrier,* on brief), for the appellants.

*Alton I. Crowell (Crowell, Deeds & Nuckols,* on brief), for the appellee.

EGGLESTON, C. J., delivered the opinion of the court.

Pursuant to Code, § 13.1-78, Pembroke Water Company, Incorporated, a Virginia corporation, filed its bill in the court below to determine the fair value of the shares of stock of C. A. Lucas and others who had dissented from the sale of the corporation's entire plant and facilities to the Town of Pembroke. The bill alleged that on November 28, 1960, the board of directors of the corporation authorized and directed the sale of its entire plant, franchise and easements to the town for the sum of $90,000; that at a meeting of the stockholders held on March 31, 1961 the majority of the stockholders, holding 62 of the 110 shares of stock of the corporation, had ratified and approved the sale, but that C. A. Lucas and others, holding 46 shares, had objected to the sale; that these dissenting stockholders had made demand on the corporation for the payment to them of the "fair value" of their shares of stock as of the date prior to that on which the sale had been approved, and that the parties had been unable to agree upon the value of such shares. The prayer of the bill was that the "equitable value of the shares of the defendants be found and determined, after allowance for the expenses of this action, of the sale, and the expenses of winding up the affairs of the corporation."

The defendants filed an answer admitting the material allegations of the bill. They also tendered a cross-bill in which they alleged that C. B. Andrews, J. L. Dillow and D. W. Mason, officers and directors of the corporation, had improperly paid to themselves excessive sums for salaries and fees for alleged services rendered the corporation in 1960 and 1961. The prayer of the tendered cross-bill was that these

named officers and directors be required to restore to the corporate treasury the amount of these illegal withdrawals.

In a decree the lower court ruled that "for the present the tendered cross-bill should not be filed as such, but that it might be filed and treated as an answer at this time," and that should it subsequently appear that it was proper that these officers and directors be brought into the proceeding as parties, permission to do so would be granted. However, this was never done.

With the consent of the parties the court appointed the engineering firms of R. Stuart Royer & Associates of Richmond and Hayes, Seay, Mattern & Mattern of Roanoke to appraise the value of the corporation's plant and facilities as of March 30, 1961. Upon consideration of these valuations and the other evidence adduced by the parties, which was heard ore tenus, the court fixed the "fair value" of the defendants' shares of stock as of March 30, 1961 at $440 per share. On this basis it entered judgments against the corporation in favor of the defendant dissenting stockholders for the respective amounts due them, with interest thereon at 2% per annum. It further decreed that the plaintiff corporation should pay the expenses of the two appraisals, plus the court costs.

While the lower court found that the named officers and directors had in fact withdrawn from the corporate treasury excessive salaries and fees for the years 1960 and 1961, it did not enter judgments against them for the amount of such excessive payments or require that they be restored to the corporate treasury.

From this decree the dissenting stockholders have appealed, claiming that the court erred (1) in fixing the value of their shares of stock at $440 each; that under the evidence adduced they should have been valued at a much larger amount; (2) in holding that Andrews, Dillow and Mason were entitled to any sums or salaries for services rendered to the corporation; (3) in not ordering these officers and directors to restore to the corporate treasury the amounts of their withdrawals for excessive salaries and fees; (4) in not entering judgments against them for the amount of their respective withdrawals; and (5) in allowing interest at the rate of only 2% on the amounts determined to be due the respective dissenting stockholders.

Pembroke Water Company, Incorporated, was organized in 1926 with C. A. Lucas as its president. He was the majority stockholder and had control and direction of the corporation until March, 1959, when control was obtained by Andrews, Dillow and Mason. By virtue of this latter control, Dillow was elected president, Mason vice-

president, and Andrews secretary-treasurer. These officers were also elected directors of the corporation.

The record gives no information as to the capital structure of the corporation other than at the time of this proceeding there were outstanding 110 shares of capital stock at the par value of $100 each. The Andrews-Dillow-Mason group owned or controlled 62 of these shares, the Lucas group 46 shares, while the remaining two shares are unclassified.

Since its organization the corporation has furnished water to the inhabitants and industries of the Town of Pembroke which according to the 1960 census had a population of 1,038. The source of the water supply is a number of springs located near the town. The distribution system consists principally of storage facilities, mains leading into and throughout the town, water meters, and the necessary rights of way.

Through the years the relations between the company and the town have not always been happy. At times the customers complained that the service was inadequate, while the corporation insisted that the rates were too low. In May, 1957, after a hearing, the State Corporation Commission authorized the corporation to increase its rates.

In the meantime the town officials and officers of the corporation had been negotiating for a sale of the plant and facilities to the town. After the Andrews-Dillow-Mason group had acquired control of the corporation these negotiations were brought to a successful conclusion. The officers of the corporation agreed to sell, and the town agreed to buy, the entire plant and facilities for the sum of $90,000. This sale was authorized by the board of directors on November 28, 1960, and approved by a majority of the stockholders on March 31, 1961. This latter action of the stockholders was over the protest of C. A. Lucas and the other defendants in the present proceeding. The sale was consummated on January 2, 1962, at which time the town, through a bond issue, had procured the necessary funds for the purchase.

Although Lucas and the other dissenting stockholders insist that the sale of the plant and facilities was not necessary and for the best interests of the corporation, the record shows that Lucas himself held a mortgage on the plant and facilities in the sum of $32,000 which was past due and for which he had demanded payment on March 26, 1960. The record also shows that the then officers of the corporation were unsuccessful in their efforts to obtain the necessary funds to pay this mortgage. Since there is no evidence that

the corporation had any other offers to purchase the plant and facilities, the sale to the town was obviously the only way out of its difficulties.

In 1959, under the Lucas management, the officers and directors were paid total annual salaries of $2,475. Under the new management the annual salaries were increased to $6,075 for 1960, and $7,200 for 1961.

The corporate records show a profit of $1,196.07 and $2,128.39 for 1958 and 1959, respectively, and a loss of $1,846.92 and $718.10 for 1960 and 1961, respectively.

The pertinent parts of Code, § 13.1-78, as amended by Acts 1956, ch. 428, pp. 522, 523, under which the present suit was brought, are printed in the margin.[1]

Since Lucas and the other dissenting stockholders were unable to agree with the corporation upon the value of their respective shares

---

[1] "In the event that a sale or exchange of all or substantially all of the property and assets of a corporation otherwise than in the usual and regular course of its business is authorized by a vote of the stockholders of the corporation, any stockholder who shall not vote all or a specified number of the shares registered in his name in favor of such a sale or exchange may, within fourteen days after the date on which the vote was taken, make written demand on the corporation for the payment to him of the fair value of such shares as of the day prior to the date on which the vote was taken. * * * Such demand shall state the number and class of the shares owned by such dissenting stockholder and covered by such demand. * * *

"If the value of such shares is agreed upon between the dissenting stockholder and the corporation, payment therefor shall be made within ninety days after the date on which the sale or exchange was effected, upon the surrender of his certificate or certificates representing such shares. Upon payment of the agreed value, the dissenting stockholder shall cease to have any interest in such shares or in the corporation.

"If the stockholder and the corporation do not so agree, then such corporation, on the written demand of any stockholder, shall, or at its election may, file a bill of complaint in the clerk's office of a Virginia court of equity in the county or city in which the registered office of the corporation, or its principal place of business in Virginia, is located praying that the fair value of such shares be found and determined. * * * All dissenting stockholders, wherever residing, shall be made parties to the proceeding as an action against their shares *quasi in rem.* * * * All stockholders parties to the proceedings shall be entitled, after a hearing without a jury, to judgment against the corporation for the amount of such fair value as of the day prior to the date on which such vote was taken approving such sale or exchange. The judge may, if he so elects, appoint one or more persons as appraisers to receive the evidence and recommend a decision on the question of value. * * * The costs of any such proceeding, including reasonable fees and expenses of any appraisers, shall be paid by the corporation, but the fees and expenses of counsel and experts retained by any party in interest shall be paid by him. The judgment shall include an allowance for interest at such rate as the judge may find to be fair and equitable in all the circumstances upon the fair value of the stock of the stockholders entitled thereto from the day prior to the date on which the vote was taken until payment."

of stock, pursuant to this statute each made written demand upon the corporation for payment of the fair value of his stock as of the day prior to the date on which the vote by the stockholders in favor of the sale was taken.

As has been said, in further compliance with the statute, the lower court appointed the two appraisers who filed their reports fixing the value of the corporation's plant and facilities.

In *Adams* v. *United States Distributing Corp.*, 184 Va. 134, 146, 34 S. E. 2d 244, 250, 162 A. L. R. 1227 (cert. denied 327 U. S. 788, 66 S. Ct. 807, 90 L. ed. 1014), we held that under Code of 1942, § 3822, as amended,[2] the term "fair cash value" of the stock of a stockholder who dissented from a merger means the intrinsic worth of the dissenter's stock, which is to be arrived at after an appraisal of all the elements of value. The same is true here under Code, § 13.1-78, of the term "fair value" of the stock of a stockholder who dissents from a sale.

Among the elements to be considered in arriving at the "fair value" or "fair cash value" of such stock are its market value, net asset value, investment value, and earning capacity. Fletcher Cyclopedia, Corporations, Vol. 13, § 5899, p. 334; 13 Am. Jur., Corporations, § 1232, pp. 1120, 1121; 19 C. J. S., Corporations, § 1615-b, p. 1378 *ff*.

In their appraisal reports Royer and Hayes fixed the value of the corporation's plant and facilities, as of March 30, 1961, at $113,460 and $91,892, respectively. There was evidence that the State Corporation Commission had fixed the value in 1957 for rate purposes at $78,153.28.

While the lower court's opinion does not detail the method used in arriving at the fair value of the dissenters' stock, it does show that the court considered the several elements of value required by the above authorities. Based on the average of the appraisal valuation of the corporation's plant and facilities as fixed by the Royer and Hayes reports, it found the "net asset value" or book value of the shares to be $513 each. Considering the "past earnings" of the corporation for 1959, 1960 and 1961, the court found the fair value of each share to be "$400 or over." In arriving at this latter figure it took into consideration what it said was the difference between the excessive salaries drawn by the officers and directors and what they were reasonably entitled to for the years 1960 and 1961. Allowing for the payment of reasonable salaries, it found that the operation would have resulted

---

[2] See Code of 1950, § 13-47. *Cf.* § 13.1-75.

in a profit instead of a loss and would have entitled the stockholders to average dividends of $22.50 per share for the years 1959, 1960 and 1961.

The opinion found the "investment value," based on the net worth of the corporation and the evidence of recent sales of stock at from $100 to $400 per share, to be "about $400." It further pointed out that since the stock was not listed, its "market value" was difficult to determine, but that the court had taken into consideration evidence of the sale of a number of shares of $100 in 1958 and evidence of the purchase by the Andrews-Dillow-Mason group of a number of shares at $400 in 1959. Based upon the payment of reasonable salaries to the officers and directors, it found that the "future earnings" should "gradually increase." Taking into consideration all of these elements or factors, the court fixed and determined the value of the shares of the dissenting stockholders at $440 per share.

While the dissenting stockholders insist on this appeal that the lower court should have fixed the fair value of their shares of stock at a much higher figure than $440 per share, they offered no evidence whatsoever to support their present contention. In this connection it is significant that Lucas, who until 1959 had been in control of the corporation and must have had intimate knowledge of its financial affairs, failed to testify. The plaintiff corporation introduced evidence that at a mandamus proceeding in 1959, to which Lucas was a party, he had testified that the shares were worth $100 each, and no more.

The dissenting stockholders attack the decision of the lower court, for basing the "net asset value" of the stock on the average of the valuation figures in the Royer and Hayes appraisal reports rather than on the higher figure in the Royer report. The difference in the two valuations was principally due to the estimated "life use" of the water mains, estimated by Royer and Hayes at 75 and 50 years, respectively. The court's opinion stated that it had adopted the Hayes figure, which, as the trier of the facts, it had the right to do. The dissenters should not complain that the court gave them the benefit of the average of the valuation figures in the two reports.

In their brief the dissenting stockholders say that "under no circumstances" can the value of their shares as of March 30, 1961 be less than the selling price of the physical assets, $90,000, plus other assets, less the corporation's indebtedness, and that under a tabulation on this basis the minimum value of the stock should be placed at $576.04. This is but another way of saying that the book value of

the stock is the sole factor to be considered in arriving at the fair value. One ready answer to this contention is that had the legislature so intended, the statute would have so provided. Moreover, the authorities agree that under such statutes the book value, or net asset value, of the stock is only one of the factors to be considered. Mere book value alone is not determinative. Fletcher Cyclopedia, Corporations, Vol. 13, § 5899.2, p. 339; 13 Am. Jur., Corporations, § 1232, p. 1121; Anno: 38 A.L.R. 2d 461.

As the lower court pointed out in its opinion, under the conflicting evidence before it the valuation could have been placed "at a much smaller amount, and perhaps at a much higher amount," than the figure of $440 per share which it concluded was proper. We hold that the determination of the fair value of the dissenters' shares of stock upon such conflicting evidence was for the trial court and that there is ample evidence to support its finding.

The dissenting stockholders next contend that the court erred in holding that Andrews, Dillow and Mason were entitled to any sums or salaries for services rendered to the corporation, because, they say, such officers and directors performed no services for its benefit. Thus, the dissenters say, the allowance of these unearned salaries depleted the assets of the corporation to their detriment. But, as the lower court pointed out in its opinion, these officers and directors had charge of the management of the corporation at a critical period, were engaged in attempting to obtain a loan to meet the demand of Lucas for the payment of the past due mortgage, and were active in negotiating the sale of the plant and facilities to the town. For such services it held that these officers and directors were entitled to reasonable salaries. We agree with that holding.

Next, the dissenters say that after the lower court had determined that Andrews, Dillow and Mason had withdrawn from the treasury of the corporation salaries in excess of what they were entitled to for the years 1960 and 1961, it should have ordered them to restore such withdrawals to the corporate treasury, and in default thereof should have entered judgments against them for the amounts of the withdrawals.

There is no substance to this contention. While such improper withdrawals were assets of the corporation, to be considered along with other assets in fixing the value of the stock, the determination of such value did not require that the amounts of these withdrawals be restored to the corporate treasury or reduced to judgment. Indeed, since these officers and directors were not parties to the proceeding,

the lower court was in no position to enter personal judgments against them.

While, as has been said, in dealing with the corporation's "past earnings" the lower court took into consideration such excessive withdrawals, its opinion does not show that it included these overpayments among the assets of the corporation in fixing the "net asset value" of the stock at $513 per share. Had they been so treated, the "net asset value" might have been increased beyond the figure fixed by the court. But it does not necessarily follow that the dissenters would be entitled to a larger valuation for their stock, for, as has been said, such "net asset value" or book value was only one of the elements or factors to be considered in determining the fair value of the stock.

We do not agree with the final contention of the stockholders that the lower court erred in fixing the allowance of interest on the respective amounts due them at 2% per annum. The statute (Code, § 13.1-78) provides that a judgment in favor of a dissenting stockholder for the value of his stock shall include an allowance for interest "at such rate as the judge may find to be fair and equitable in all the circumstances." Thus, under the plain language of the statute, the amount of the allowance of interest is left to the discretion of the trial court. In its decree the court expressly stated that it found the allowance of interest at the rate of 2% "to be fair and equitable in all the circumstances." There is no showing to the contrary.

On the whole, we find no error in the decree appealed from, and it is

*Affirmed.*