871 So.2d 1047 (2004)
Dwayne R. BOETTCHER; Larry E. Cheek; Karl T. and Phyllis J. Coles; Michael T. and Lara M. Coles; Gian A. and Susan S. Cossa; Gian A. Cossa; Susan S. Cossa; Linda and Joseph Costello; DNA Data Systems; Albert C. and Laura A. Damico; Paul and Diana Dexter; David Dunn; Robert Eckardt; Susan Eipert; Donald J. Farris; David Fenlon; Thomas Fountain; Judith J. Gaglani; Eugene Harley; Raghab Inkibar; Abdulkader M. Inkidar and Kathy J. Inkidar; Inkidar Enterprises, Inc.; Craig L. and Lisa J. Kaufman; Mark Stuart Keeler; Robert J. King, Jr.; Laura Irene Lizotte; Cherrie B. McKenzie; Dennis Noon; Dean W. Oswald; Jose Romeo Posada; Sydney B. Self, Jr.; Shi Jian; O. Phillip Smith; David Storf; Brian Troxell; James Varanelli; Mary A. and Gary W. Vinesett; Peter Williams; Daniel J. Ziegler, Appellants,
v.
IMC MORTGAGE COMPANY, Appellee.
No. 2D03-3101.
District Court of Appeal of Florida, Second District.
May 12, 2004.
*1048 Richard E. Brodsky of Brodsky & Mullin, P.A., Coconut Grove, for Appellants.
John R. Hamilton of Foley & Lardner, Orlando; and Scott D. Richburg and Jessie L. Harrell of Foley & Lardner, Jacksonville, for Appellee.
WALLACE, Judge.
In this case, we are called upon to determine whether the circuit court properly entered a final summary judgment in a dissenters' rights action filed pursuant to section 607.1320, Florida Statutes (1999). IMC Mortgage Company, a Florida corporation (IMC), filed the action against IMC shareholders (the dissenters) who had opposed the sale of a substantial amount of IMC's assets to a subsidiary of Citigroup, Inc., and then perfected their rights under the dissenters' rights statute. On motion filed by IMC, the circuit court entered a final summary judgment that determined the "fair value" of the dissenters' IMC shares on the relevant date to be $0,035 per share. We conclude that IMC failed to meet its burden on summary judgment of proving that the fair value of the dissenters' shares was $0.035 per share as it maintained. Therefore, we reverse the final summary judgment, and we remand this case to the trial court for further proceedings.

Facts and Procedural History
*1049 IMC is a publicly held corporation.[1] On November 15, 1999, IMC sold a substantial amount of its assets to Citifinancial Mortgage Company, a subsidiary of Citigroup, Inc. Pursuant to section 607.1202, a majority of the shareholders of IMC were required to approve the sale. At a vote taken on November 12, 1999, the requisite majority of shareholders voted to approve the proposed transaction.
IMC shareholders who elected to dissent from the sale had dissenters' rights pursuant to section 607.1320. A number of shareholders served notice of their intent to dissent from the sale and demanded payment of the fair value of their IMC shares. These shareholders also deposited or agreed to deposit all of their share certificates with IMC. The relevant date for the determination of the fair value of the dissenters' shares was November 11, 1999, the day prior to the vote for approval of the sale.
IMC filed an action in the circuit court pursuant to section 607.1320(7) to determine the fair value of the dissenters' shares. The dissenters answered and requested a determination of the fair value of their IMC shares as of the relevant date and judgment against IMC for the amount of the fair value of each of the dissenters' shares.
IMC subsequently moved for summary judgment, contending that the fair value of IMC stock on the relevant date was $0.035 per share. In support of its motion, IMC relied on the allegations of its complaint that had been verified by its president.[2] Pertinent to the issue of the fair value of its shares, the complaint alleged facts purporting to establish that $0.035 per share was the closing price for IMC stock on the relevant date:
4. IMC is a publicly owned corporation and its shares are traded on an interdealer quotation system.
....
13. On November 11, 1999, the relevant date for determination of "fair value" of dissenters' shares pursuant to § 607.1301(2), Fla. Stat. (1999), the stock closed at $00.035 on volume of 756,100.
....
15. During the approximate one month prior to November 11, 1999, IMC's shares traded in a closing price range from $00.0271 to $00.054, on daily volume ranging from 756,100 to 25,100 shares.
Opposing IMC's motion for summary judgment, the dissenters did not dispute the allegations of IMC's complaint concerning the closing price of IMC's stock on the relevant date or the closing price range during the one-month period prior to that date.[3] The dissenters argued, instead, *1050 that the closing price of IMC stock on the relevant date was negatively affected by the impending transaction. In support of their position, the dissenters relied on the affidavit of Stephen K. Halpert, a law professor who was offered as an expert in the fields of corporate law, securities regulation, and financial markets. In his affidavit, Halpert opined:
5. It is my expert opinion that the closing market price of IMC common stock the day before the shareholder vote on the Citigroup Sale, which IMC asserts is 3.5 cents per share, is not indicative of and does not determine "fair value" under the Act for the purpose of compensating dissenting shareholders under the Act. To hold otherwise would be inconsistent with the text, purpose and history of the Act.
....
8. In particular, it is apparent to me that the closing price of IMC shares on the OTCBB on November 11, 1999 was primarily determined by the anticipated effect of the Citigroup Sale, rather than the intrinsic value of the IMC [sic]. According to the proxy statement dated September 29, 1999 that was circulated by the management of IMC to shareholders to solicit their votes to approve the Citigroup Sale (the "IMC Proxy"), if the transaction were not approved, IMC would file for bankruptcy, which, according to management, would result in IMC shareholders losing their entire interest. Given management's representation of the alleged alternative in the IMC Proxy, shareholder approval was likely to be regarded by the market as virtually certain.
9. Moreover, because dissenters' rights are only available to shareholders entitled to vote, and because voting on the Citigroup Sale transaction was limited to IMC shareholders of record on September 17, 1999, a purchaser of IMC shares in the OTCBB market on November 11, 1999 would not be entitled to dissent and be paid "fair value" for his shares. Fla. Statutes § 607.1302(b) [sic]. Thus, even a buyer who believed on November 11, 1999 that IMC was worth more than represented by management in the proxy would be unwilling to pay a price greater than the maximum possible residual value of IMC shares after the Citigroup Sale transaction. Since the relevant section of the Act defines "fair value" so as to exclude the anticipated effects of the challenged corporate action (unless exclusion would be inequitable), determining the "fair value" of IMC's common stock on the basis urged by IMC would clearly be violative of the Act, and it would be highly inequitable if the Court were to apply the valuation method urged by IMC.
....
11. For the foregoing reasons, granting Plaintiff summary judgment on the basis of the closing market price on *1051 November 11, 1999 would bind defendants to the consequences of the Citigroup Sale notwithstanding their dissent, and would deny them the remedy of a fair valuation as intended by the Florida Business Corporation Act. Instead, to fulfill the requirements of the Act, the Court must conduct a factual inquiry to ascertain the "fair value" of IMC common stock, exclusive of any depreciation that resulted from the transaction.
Relying upon Halpert's affidavit, the dissenters argued that IMC was not entitled to a summary judgment because it had failed to establish the fair value of its shares on the relevant date.
After a hearing, the circuit court granted IMC's motion. In its final summary judgment, the circuit court accepted IMC's evidence of value and found that "[t]he fair value of Defendants' [the dissenters'] shares of IMC common stock on November 11, 1999, was $0.035 per share." From the final summary judgment, the dissenters have taken this appeal.

Summary Judgment
A final order granting a summary judgment is subject to de novo review. Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000). A party moving for a summary judgment must conclusively demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fla. R. Civ. P. 1.510; Holl v. Talcott, 191 So.2d 40, 43 (Fla.1966); First N. Am. Nat'l Bank v. Hummel, 825 So.2d 502, 503 (Fla. 2d DCA 2002). Once the moving party meets its burden, then the party opposing entry of a summary judgment must prove the existence of genuine triable issues. Holl, 191 So.2d at 43-44; First N. Am. Nat'l Bank, 825 So.2d at 503.
In this case, the allegations of IMC's verified complaint purported to establish the fair value of its shares on the relevant date. On the other hand, the dissenters did not submit any evidence concerning the fair value of IMC's shares. Instead, the dissenters offered an affidavit that challenged IMC's methodology as insufficient to establish the fair value of its shares within the meaning of the statute. Under this state of the record, the issue presented is whether IMC met its burden of demonstrating its entitlement to summary judgment.
IMC argues that the Halpert affidavit was insufficient to withstand summary judgment. As IMC correctly observes, Professor Halpert did not offer an opinion concerning what the preferable method of valuation would be or what value that method would produce. Citing Lufthansa German Airlines Corp. v. Mellon, 444 So.2d 1066 (Fla. 3d DCA 1984), IMC argues that the dissenters "cannot create a genuine issue of material fact sufficient to preclude summary judgment by attempting to create facts within IMC's unrebutted evidence." However, before deciding the summary judgment issue, we must first consider the meaning of the term "fair value" as it is used in section 607.1301(2), Florida Statutes (1999).

Fair Value
Shareholder notice and consent requirements and dissenters' rights statutes "are intended to insure that directors do not fundamentally change the nature of the shareholders' investments without the check and balance of informed shareholder approval, and the opportunity for dissenters to withdraw from the corporation." S. End Improvement Group, Inc. v. Mulliken, 602 So.2d 1327, 1332 (Fla. 4th DCA 1992). A critical part of Florida's statutory scheme giving dissenters the right to withdraw from the corporation is section 607.1301(2), which defines the term "fair value" for purposes of the dissenters' *1052 rights statute: "`Fair value,' with respect to a dissenter's shares, means the value of the shares as of the close of business on the day prior to the shareholders' authorization date, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable." [4]
Research discloses no reported Florida cases interpreting the term "fair value" as used in the dissenters' rights statute. Courts in other jurisdictions[5] have generally rejected the notion that "fair value" is synonymous with "fair market value." See Pueblo Bancorporation v. Lindoe, Inc., 63 P.3d 353, 363 (Colo.2003); Tri-Continental Corp. v. Battye, 74 A.2d 71, 72 (Del.1950); Wenzel v. Hopper & Galliher, P.C., 779 N.E.2d 30, 38 (Ind.Ct. App.2002); First W. Bank Wall v. Olsen, 621 N.W.2d 611, 617 (S.D.2001); Matthew G. Norton Co. v. Smyth, 112 Wash.App. 865, 51 P.3d 159, 163-65 (2002); HMO-W, Inc. v. SSM Health Care Sys., 234 Wis.2d 707, 611 N.W.2d 250, 255 (2000). Pertinent to our consideration of the meaning of the term "fair value" is the statutory requirement that the valuation process must exclude "any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable." § 607.1301(2), Fla. Stat. (1999). The requirement to exclude both positive and negative effects of the impending transaction from the valuation process follows from the statutory criterion of fair value instead of fair market value. As one commentator explains:
Statutes establishing dissenters' rights and alternative remedies such as judicial buy-outs uniformly refer to "fair" price as opposed to "fair market" price. The rationale underlying this language is the recognition that the events that trigger the valuation process may either disrupt or preclude the market for the shares, if in fact such a market ever existedas in the case of a closely held corporation.... Courts generally have noted that these statutory provisions have been enacted for the benefit of minority shareholders and that minority shareholders ought not to be punished in the valuation process.
Charles W. Murdock, The Evolution of Effective Remedies for Minority Shareholders and Its Impact Upon Valuation of Minority Shares, 65 Notre Dame L.Rev. 425, 484 (1990) (footnotes omitted). For these reasons, the omission to exclude market-driven forces resulting from anticipation of the impending transaction would not be in accord with the goal of ascertaining the fair value of the shares to be valued.
In Armstrong v. Marathon Oil Co., 32 Ohio St.3d 397, 513 N.E.2d 776 (1987), the Supreme Court of Ohio had occasion to construe a dissenters' rights statute requiring payment of the "fair cash value" of *1053 the dissenters' shares. The Ohio statute included the following mandate: "In computing such fair cash value, any appreciation or depreciation in market value resulting from the proposal submitted to the directors or to the shareholders shall be excluded." Id. at 784 n. 11. Concerning this requirement, the Ohio court said:
[T]he statute requires that any effects of the subject transaction which are caused by either appreciation or depreciation of the market price must be removed from such price. Admittedly, merely adopting the market price established by the trading activity on the day before the vote to initiate the merger may not suffice to fully eliminate such effects. However, Ohio's statutory mandate is sufficiently broad to allow inquiry into such factors as may have created a price disparity. The valuation remedy clearly is a remedy that does not give dissenting shareholders any element of value attributable to the transaction from which they have dissented. On the other hand, any factors relating to the merger which have artificially depressed the stock's price ought not to create a windfall for the tenderer at the expense of the dissenter.
Id. at 788 (footnotes omitted). For similar reasons, absent factors making exclusion inequitable, the determination of the "fair value" of IMC's shares in the circuit court required the exclusion of any appreciation or depreciation in IMC's shares based upon anticipation of the consummation of the proposed asset sale.

Analysis
In light of the meaning of "fair value" within the dissenters' rights statute, we conclude that IMC was not entitled to a summary judgment. In order to meet its burden of demonstrating its entitlement to summary judgment, IMC was required to establish a prima facie case that the fair value of IMC shares on the relevant date was, as it contended, $0.035 per share. The dissenters were not required to prove the existence of genuine issues of material fact unless IMC first met its burden. See Holl, 191 So.2d at 43-44; First N. Am. Nat'l Bank, 825 So.2d at 503.
IMC's verified complaint did not address the factor of excluding the appreciation or depreciation in the value of its shares in anticipation of the proposed transaction. Moreover, IMC did not suggest in its verified complaint or otherwise that such exclusion would be inequitable. The only evidence IMC offered on the valuation issue was the closing price of its shares on the relevant date and the closing price range of the shares during the one-month period prior to the relevant date. For the purpose of determining the fair value of IMC's shares, the exclusion of any appreciation or depreciation in anticipation of the proposed transaction was required by section 607.1301(2) unless exclusion would be inequitable. Since the closing price of IMC shares on the relevant date did not exclude appreciation or depreciation in anticipation of the proposed transaction and IMC did not contend that exclusion was inequitable, IMC's submission of evidence of the closing price of its shares on the relevant date was insufficient to establish a prima facie case on the issue of fair value.[6] *1054 Therefore, IMC failed to carry its burden of demonstrating its entitlement to summary judgment.
For this reason, we reverse the final summary judgment in favor of IMC, and we remand this case to the circuit court for further proceedings.
Reversed and remanded.
FULMER and KELLY, JJ., Concur.
NOTES
[1] The facts, which are drawn from the pleadings, answers to interrogatories, documentary evidence, and supporting affidavits, are reviewed in the light most favorable to the dissenters as the nonmoving party. See Markowitz v. Helen Homes of Kendall Corp., 826 So.2d 256, 259 (Fla.2002).
[2] IMC did not file an affidavit in support of its motion for summary judgment. A verified complaint may serve the same purpose as an affidavit supporting or opposing a motion for summary judgment. See Rinzler v. Carson, 262 So.2d 661, 665 (Fla.1972); Booth v. Bd. of Pub. Instruction of Dade County, 67 So.2d 690, 691 (Fla.1953). However, in order to be so considered, the allegations of the verified complaint must meet the requirements of the rule governing supporting and opposing affidavits. See Fla. R. Civ. P. 1.510(e); Cent. Bank & Trust Co. v. Davis, 102 So.2d 600, 603-04 (Fla.1958). In this case, the dissenters did not raise a procedural objection to the adequacy of IMC's verified complaint under the rule.
[3] Although the dissenters did not dispute IMC's allegations about the closing price of IMC's shares, they did contend that IMC was not entitled to a summary judgment solely on the basis of the closing stock market price on the relevant date because IMC's shares were not traded on an efficient market. The dissenters offered evidence that, on the relevant date, IMC's shares were not traded on a national securities exchange or on the NASDAQ Stock Market (NASDAQ). IMC's stock was de-listed from the NASDAQ in April 1999. Thereafter, IMC's stock was traded on the Over the Counter Bulletin Board (the OTCBB). According to the dissenters, the market for IMC's shares was "illiquid," and the closing price of IMC stock on the OTCBB was not a reliable measure of value. The dissenters contended that these matters created a genuine issue of material fact concerning whether IMC stock was traded on an efficient market. According to the dissenters, this issue precluded the entry of a summary judgment for IMC. Our resolution of this case makes it unnecessary for us to address this issue.
[4] The statutory definition of "fair value" has been amended effective October 1, 2003. Ch.2003-283, § 21, at 2914, § 44, at 2931, Laws of Fla. The amendment is not applicable to this case.
[5] "Florida's dissenters' rights statutes are based, in part, on the Revised Model Business Corporation Act (RMBCA), adopted by the American Bar Association in 1984, and relevant portions of the Georgia Business Code (1989)." Michael V. Mitrione, Dissenters' Rights, in Florida Corporate Practice § 11.1 (Fla. Bar CLE 4th ed.2002). Therefore, we may look for guidance to cases from other jurisdictions that have adopted the provisions of the RMBCA in substantially the same form. We may also look to the law of Delaware for guidance because "[t]he Florida courts have relied upon Delaware corporate law to establish their own corporate doctrines." Connolly v. Agostino's Ristorante, Inc., 775 So.2d 387, 388 n. 1 (Fla. 2d DCA 2000) (quoting Int'l Ins. Co. v. Johns, 874 F.2d 1447, 1459 n. 22 (11th Cir.1989)).
[6] We do not address the separate but related issue of whether evidence of market price excluding any appreciation or depreciation in anticipation of the impending sale, by itself, would have satisfied IMC's initial burden on motion of summary judgment had IMC offered such evidence. We note that courts in other jurisdictions suggest that for purposes of the dissenters' rights statute, the market price of the stock should not be used as the sole measure of its value. Delaware cases have equated "fair value" to "`the true or intrinsic value' of the shareholders' proportionate interest in the company, valued on a going-concern rather than a liquidated basis." Cede & Co. v. Technicolor, Inc., 542 A.2d 1182, 1186 (Del.1988); see also Cavalier Oil Corp. v. Harnett, 564 A.2d 1137, 1142 (Del. 1989); Atl. States Constr., Inc. v. Beavers, 169 Ga.App. 584, 314 S.E.2d 245, 249 (1984); Independence Tube Corp. v. Levine, 179 Ill. App.3d 911, 129 Ill.Dec. 162, 535 N.E.2d 927, 931 (1988); Sieg Co. v. Kelly, 568 N.W.2d 794, 798 (Iowa 1997); Lucas v. Pembroke Water Co., 205 Va. 84, 135 S.E.2d 147, 150 (1964). Accordingly, courts should consider "proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court." Weinberger v. UOP, Inc., 457 A.2d 701, 713 (Del.1983). This may include net asset values, market price, earnings, and the like. Id. at 712. Under this view, the market price of a company's stock is only one relevant factor among many to be considered in determining the fair value of dissenting stockholders' shares. Tri-Continental Corp., 74 A.2d at 72.