# CIRCUIT COURT OF FAIRFAX COUNTY

U.S. Inspect, Inc.

    v.

Noris F. McGreevy

November 27, 2000

Case No. (Chancery) 160966

BY JUDGE STANLEY P. KLEIN

On March 17, 2000, Petitioner U.S. Inspect, Inc. ("USI") filed its Motion for Entry of Post-Trial Protective Order and Memorandum in Support. Respondent Noris F. McGreevy filed a Memorandum in Opposition, and the Court heard oral argument from the parties. After a thorough review of the record, the briefs of the parties, and the controlling authorities, this Court denies USI's Motion for Entry of Post-Trial Protective Order for the reasons articulated below.

USI seeks a protective order governing the disclosure of "Confidential Information" disclosed at trial. On August 6, 1999, the Court entered a pre-trial order limiting the disclosure of confidential information to qualified persons ("Confidentiality Order"). At trial on March 6-8, 2000, a great deal of sensitive financial data that previously had been protected by the Confidentiality Order was introduced into the trial record through exhibits and witness testimony. USI argues that a protective order is the only way to

protect the company's sensitive financial data[1] and asserts that this lawsuit was mandated by statute, not instituted by choice.

McGreevy responds that previously "confidential" matters have been made public by the proceedings themselves. Noting that the trial proceedings were indeed open to the public, McGreevy argues that anyone could have learned the details of the financial data in question simply by sitting in the courtroom.

In *Shenandoah Publishing v. Fanning*, 235 Va. 253, 368 S.E.2d 253 (1988), the Virginia Supreme Court held that, subject to statutory exceptions, a rebuttable presumption of public access applies to judicial records in civil proceedings, as well as criminal proceedings. *Id.* at 258. The Court noted the constitutional underpinnings of openness in criminal proceedings, but did not find it necessary to conduct a constitutional analysis regarding the openness of civil proceedings. Instead, the Court referred to Va. Code § 17-43, the predecessor statute to Va. Code § 17.1-208, which provides in pertinent part as follows: "The records and papers of every circuit court shall be open to inspection by any person and the clerk shall, when required, furnish copies thereof, except in cases in which it is otherwise specially provided." Va. Code § 17.1-208. The Court noted that Va. Code § 17-43 dated back to the Code of 1849 and that it reflected the General Assembly's intent to recognize the generally accepted common-law rule of openness. The Court held that the presumption of public access could be rebutted by "establishing an interest so compelling that it cannot be protected reasonably by some measure other than a protective order." *Shenandoah Publishing*, 235 Va. at 258.

USI argues that a compelling interest exists here because sensitive, non-public, financial information about the company was presented during a proceeding in which the company was required to participate by law. In *Shenandoah Publishing*, however, the Virginia Supreme Court specifically opined that abstract financial harm could not constitute sufficient cause to seal judicial records. *Id.* at 259 ("Nor do we believe that risks of damage to professional reputation, emotional damage, or financial harm, stated in the abstract, constitute sufficient reasons to seal judicial records."). Hence, there is no legal basis for this Court to grant the relief sought by USI. The Court need not consider the public nature of the trial proceedings because, as a matter of law, USI's argument is insufficient to rebut the presumption of public access.

---

[1] The Court urged the parties to work towards a post-trial confidentiality agreement to protect the company's interests. The instant motion ensued as a result of unsuccessful attempts to reach such an agreement.

Accordingly, the Motion for Entry of Post-Trial Protective Order is denied.

Petitioner U.S. Inspect, Inc., timely commenced this statutory action in response to Respondent Noris F. McGreevy's demand for payment of the "fair value" of her shares in USI, pursuant to the Dissenter's Rights article of the Virginia Stock Corporation Act. See Va. Code Ann. § 13.1-729 *et seq.* (Michie 1999 & Supp. 2000). This Court has fully considered the testimony and exhibits presented by the parties, the arguments of counsel and the applicable authorities and now determines the value of McGreevy's shares and accrued interest as required by § 13.1-740 of the Virginia Code.

## I. *Background*

McGreevy previously held 115,533.6 shares of Radonics, Inc., USI's former parent company. On December 31, 1998, Radonics, a closely held Virginia corporation co-founded by Respondent's husband John McGreevy and others, merged into USI, its wholly owned inactive subsidiary. This merger was effected to take advantage of USI's name and its status as a Delaware corporation. The shareholders of Radonics were offered the same number of shares in USI that each had previously held in Radonics. McGreevy properly dissented to this "downstream merger."

Pursuant to § 13.1-737 of the Virginia Code, USI tendered to McGreevy $82,028.88 on March 15, 1999, which equated to $0.71 per share for her stock in USI, plus interest. McGreevy responded by demanding $2.50 per share for her USI stock. This statutory action followed.

At trial, USI relied principally on the testimony of its retained valuation expert Anatole G. Richman of Richman Associates. McGreevy presented her own valuation expert, Joseph Estabrook of Ellin and Tucker, Chartered. The court found both Richman and Estabrook eminently qualified, enlightening, and fully conversant in the applicable valuation principles. Each expert had undertaken a significant investigation into Radonics' financial situation in the years leading up to the merger and had prepared a comprehensive report. Further, each expert conceded that valuations of closely held corporations involve both science and art. Thus, relying on the scientific principles utilized by the experts and the applicable legal authorities, the court now resolves the areas of dispute between the experts and establishes an appropriate value for McGreevy's shares of stock in USI.

## II. *Applicable Virginia Authorities*

Virginia Code § 13.1-740 mandates that in a dissenting shareholder's action, the court "determine[s] the fair value of the shares and accrued interest." Fair value with respect to this statutory scheme is defined as "the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable." Va. Code Ann. § 13.1-729. The statutory scheme, however, provides no further guidance on how to determine fair value.

Only two published opinions in Virginia have addressed the concept of fair value. Initially, in *Adams v. United States Distrib. Corp.*, 184 Va. 134, 34 S.E.2d 244 (1945), the Virginia Supreme Court defined "fair cash value" as "the intrinsic worth of the dissenter's stock, which is to be arrived at after an appraisal of all the elements of value." *Adams*, 184 Va. at 146 (quoting *Miller v. Canton Motor Coach*, 58 Ohio App. 94, 16 N.E.2d 486 (1937)). Later, in *Lucas v. Pembroke Water Co.*, 205 Va. 84, 135 S.E.2d 147 (1964), the Supreme Court approvingly cited its decision in *Adams*, and opined that "among the elements to be considered in arriving at the 'fair value' or 'fair cash value' of such stock are its market value, net asset value, investment value, and earning capacity." *Lucas*, 205 Va. at 89.

No Virginia case, however, has specified how a court is to weigh these various elements or determine the relationship between "fair value" and "fair market value." Fair market value is generally relevant at the time of an asset's proposed sale as it is defined as the price that a willing buyer would pay and for which a willing seller would sell the asset, when neither is under a compulsion to buy or sell. Fair value of stock, on the other hand, has often been defined by commentators and courts alike as the shareholder's "proportionate interest in the going concern." See *Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 553 (Del. 2000); *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1145 (Del. 1989); *Lawson Mardon Wheaton, Inc. v. Smith*, 160 N.J. 383, 734 A.2d 738, 749 (N.J. 1999) (citing 2 A.L.I., *Principles of Corporate Governance*, § 7.22 (1994)). The rationale underlying that approach centers on the assumption that absent the extraordinary corporate action, the dissenting shareholders would have been willing to maintain their investments. See *Paskill*, 747 A.2d at 553. As such, "the fair value of a dissenter's shares is to be determined on their worth in a going concern, not in liquidation, and fair value is not necessarily tied to market value as reflected in actual stock trading." *Friedman v. Beway Realty Corp.*, 87 N.Y.2d 161, 661 N.E.2d 972, 975-76, 638 N.Y.S.2d 399 (N.Y. 1995). A review of Virginia common law and the statutory predecessors to Virginia

Code §§ 13.1-729, *et seq.*, is instructive in deciding whether Virginia courts should adopt the "proportionate interest in the going concern"[2] approach to determining fair value.

Historically, under the common law, any shareholder of a Virginia corporation could preclude extraordinary corporate action simply by refusing to provide assent. Prior to 1903, under the common law, a shareholder could prevent consolidation, merger, or sale of corporations or corporate assets by merely refusing to agree to it. See *Winfree v. Riverside Cotton Mills*, 113 Va. 717, 724, 75 S.E. 309 (1912). Then, in 1903, the Virginia General Assembly enacted "Chapter 270 — An Act Concerning Corporations," which provided a remedy for a dissatisfied stockholder in the event of consolidation or merger. See 1902 Va. Acts, ch. 270. Hence, a dissenter could no longer block the transaction. See 1902 Va. Acts, ch. 270. The 1903 Act concerning corporations was then codified in the 1904 Code of Virginia. See Va. Code. Ann. § 17-1105e(41) (West 1904); see also *Winfree*, 113 Va. at 719. Under subsection 41 of § 17-1105e, a dissatisfied stockholder was entitled to receive the "fair cash value" of the stock as of the day before the vote was cast. When applying § 1105e(41) in *Winfree*, the Virginia Supreme Court referred to the "actual value" at the date of consolidation. See 113 Va. at 724 ("To ascertain that value, under the allegations of the bill, investigations into the condition of the Riverside Cotton Mills may have to be made and accounts taken.") Yet, no further guidance for determining value was provided in the Court's opinion.

An Amendment to § 17-1105e in 1922 expanded the duties and powers of court-appointed appraisers, and provided that a judge could either confirm the findings or set them aside and make an independent determination of the "fair cash value" of the shares. See 1922 Va. Acts § 3822 (as amended & re-enacted March 24, 1922). Dissenters' rights were then re-codified in § 34-3822 of the Virginia Code in 1942. See Va. Code Ann. § 34-3822 (Michie 1942). Section 34-3822 likewise provided that the dissatisfied stockholder was entitled to receive the "fair cash value" of the shares as of the day before the vote regarding consolidation or merger.

In 1945, the Virginia Supreme Court provided some guidance regarding the parameters of value under the dissenter's rights statutory scheme in *Adams v. United States Distrib. Corp.*, 184 Va. 134, 34 S.E.2d 244 (1945). In *Adams*, the Court rejected the petitioner's claim of entitlement to a

---

[2]  See *Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 553 (Del. 2000); *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1145 (Del. 1989); *Lawson Mardon Wheaton, Inc. v. Smith*, 160 N.J. 383, 734 A.2d 738, 749 (N.J. 1999).

"contractual value" which the petitioner urged was "provided for in the corporation's charter." *Adams*, 184 Va. at 146. The Supreme Court held that the statutory remedy set out in the code was the exclusive remedy available to the dissatisfied shareholder. "The design of the statute is to assure to the dissenting stockholder that he will be fully compensated for the value of that of which he has been deprived by the merger, and no more." *Adams*, 184 Va. at 146. The Court opined that the term "actual value" used in the *Winfree* opinion was "practically synonymous" with "fair cash value." *Adams*, 184 Va. at 145. The *Adams* Court defined "fair cash value" as "the intrinsic worth of the dissenter's stock, which is to be arrived at after an appraisal of all the elements of value." 184 Va. at 146.

Thereafter, the Code of Virginia of 1950 established dissenting stockholders' remedies in § 13-47 (in the event of consolidation or merger) and § 13-85 (in the event of sale). See Va. Code Ann. §§ 13-47, 13-85 (Michie 1950). Under these code sections, the dissenting shareholder was entitled to receive "fair cash value" for the shares as of the day before the vote. "Fair value" was substituted for "fair cash value" as a result of the Acts of Assembly of 1956, which repealed and recodified the general corporation laws of Virginia. See 1956 Va. Acts, ch. 428. Under the amended code, dissenter's rights were re-codified in § 13.1-75. Pursuant to § 13.1-75 a dissenting shareholder was entitled to receive the "fair value" of the shares as of the day before the vote.

Next, in *Lucas v. Pembroke Water Co.*, 205 Va. 84, 135 S.E.2d 147 (1964), the Virginia Supreme Court addressed the amended statutory scheme. In its opinion, the Court treated the terms "fair cash value" and "fair value" as synonymous and expanded the *Adams* definition, to provide that market value, net asset value, investment value, and earning capacity are *among* the elements to be considered in determining fair value. *Lucas*, 205 Va. at 88 (citing 13 *Fletcher Cyclopedia* § 5899; 13 Am. Jur., *Corporations*, § 1232; 19 C.J.S., *Corporations*, § 1615) (emphasis added).

Finally, the Acts of Assembly of 1985 repealed §§ 13.1-75 and 13.1-78 and recodified them in relevant part at §§ 13.1-729, 13.1-730, and 13.1-740 of the Code. See 1985 Va. Acts, ch. 522; Va. Code Ann. § 13.1-729 *et seq.* (Michie 1999 & Supp. 2000). Section 13.1-729[3] now defines "fair value;"

---

[3] " 'Fair value,' with respect to a dissenter's shares, means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable." Va. Code Ann. § 13.1-729 (Michie 1999 & Supp. 2000).

§ 13.1-730 delineates the circumstances under which a shareholder has the right to dissent and obtain payment for the fair value of the shares; and § 13.1-740 provides for court action to determine fair value when the parties are unable to agree.

Thus, by the enactment and amendment of the statutory scheme since 1903, the Virginia General Assembly has taken away the veto power previously held by dissenting shareholders and provided them with a means of having their shares redeemed by the corporation for the *"intrinsic* worth of the dissenter's stock." *Adams*, 184 Va. at 146 (emphasis added). As the Supreme Court noted in *Adams*, "the design of the statute is to assure the dissenting stockholder that he will be fully compensated for *the value of which he has been deprived* by the merger and *no more." Id.* (emphasis added).

These concepts articulated by the Virginia Supreme Court in *Adams* and *Lucas* are entirely consistent with a valuation methodology based upon a proportionate interest in an ongoing business. See *Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549 (Del. 2000); *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1145 (Del. 1989); *Lawson Mardon Wheaton, Inc. v. Smith*, 160 N.J. 383, 734 A.2d 738, 749 (N.J. 1999). They are also consonant with placing a shareholder in the same position that would have existed absent the corporate action, which triggered the shareholder's exercise of the statutory dissenting rights. As the statutory scheme was intended to provide an equitable means of compensating shareholders for the loss of their common law veto power, it is altogether logical to value their stock as if the triggering corporate action had not occurred. This court therefore accepts the rationale underlying the decisions of *inter alia*, the Delaware, New Jersey, and New York courts and will value McGreevy's stock based upon her proportionate interest in Radonics, before its merger with USI. In determining the value of closely held businesses for equitable distribution purposes, the Virginia Court of Appeals has looked to the "intrinsic value" to the actual parties, whether the asset was to be sold or not. See *Howell v. Howell*, 31 Va. App. 332, 342, 523 S.E.2d 514 (2000); *Bosserman v. Bosserman*, 9 Va. App. 1, 6, 384 S.E.2d 104 (1989).

Absent controlling precedent from the Virginia Supreme Court, this court must also determine the full panoply of elements of value to be considered in determining McGreevy's proportionate interest in USI as a going concern. In *Lucas v. Pembroke Water Co.*, the Supreme Court held that market value, net asset value, investment value and earning capacity were merely *"among* the elements to be considered in determining fair value." 205 Va. at 88 (emphasis supplied). Here, again, this court looks to the decisions of the Supreme Court of Delaware for guidance.

In the seminal case of *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1982), the Delaware Supreme Court addressed the elements of value that the Delaware courts should consider in determining fair value under Delaware's dissenting shareholder statutory scheme. Although the *Weinberger* Court was actually deciding a breach of fiduciary duty case arising from a merger, it analogized its analysis to that which would be undertaken in a statutory appraisal action. It rejected continued use of the so-called "Delaware block methodology" and opined as follows:

> We believe that a more liberal approach must include proof of value by any techniques or methods, which are generally considered acceptable in the financial community and otherwise admissible in court: ... This will obviate the very structured and mechanistic procedure that has heretofore governed such matters. Fair price obviously requires consideration of all relevant factors involving the value of a company.

*Weinberger*, 457 A.2d at 713 (punctuation and citations omitted).

Relying upon its earlier decision in *Tri-Continental Corp. v. Battye*, 31 Del. Ch. 523, 74 A.2d 71 (Del. 1950), the Delaware Supreme Court held that:

> In determining what figure represents this true or intrinsic value, the appraiser and the courts must take into consideration all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise, and any other facts which were known or which could be ascertained as of the date of merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholders' interest, but must be considered by the agency fixing the value.

*Weinberger*, 457 A.2d at 713 (quoting *Tri-Continental Corp. v. Battye*, 31 Del. Ch. 523, 74 A.2d 71, 72 (Del. 1950)).

This court is persuaded by the decisions of the Delaware Supreme Court that a case-by-case analysis of the elements of value in a corporation must be undertaken in order to meet the goals of Virginia's dissenting shareholders statutory scheme. Within this analytical framework, the court will address the evidence of value presented by the parties at trial and will evaluate the conclusions reached by the parties' experts in their appraisals.

### III. *The Appraisals*

Richman and Estabrook agree that appraisers generally utilize three methods of valuing closely held corporations: (1) the asset or cost approach; (2) the market approach; and (3) the income approach. The asset approach measures a company's value based upon its total assets minus its liabilities. The market approach compares the subject company or its stock with other "similar" businesses, or securities, which have been sold and determines value through appropriate adjustments to the sales price obtained for the other asset. The income approach is based upon a company's ability to generate earnings and positive cash flow.

Appraisers utilize two separate approaches when determining value based upon income. Under the first, the capitalization of cash flow approach, the company's historical income stream is divided by the rate of return that a reasonable investor would require on an investment in the particular company (cap rate). The higher the risk involved in the investment, the higher the cap rate and therefore the lower the value of the company. The second approach, the discounted future cash flow method (DCF), measures value as (1) a forecast of future cash flows for a set period of time, discounted to present value, plus (2) the anticipated residual value of the company at the end of the period of projected future cash flows, again reduced to present value.

When appraising certain assets, utilization of all three approaches may be beneficial. However, service oriented companies, like USI, do not often lend themselves to valuation by the asset approach as their major assets are generally the business plans and skills of their executives and other employees. Both Richman and Estabrook concur that valuation of USI through the asset approach would seriously undervalue USI. As a result, both experts rejected consideration of this approach. The parties' experts also agreed that utilization of the DCF model for determining value through projected cash flows would render an appropriate measure of the value of USI. Richman concluded that use of the capitalization of earnings methodology would provide an equally compelling basis for measuring USI's fair value. Estabrook disagreed and utilized the market approach as his second means of calculating USI's fair value. Estabrook weighted the DCF method 60 percent and the market approach 40 percent in his analysis. Finally, both Richman and Estabrook determined that adjustments to their opinions needed to be undertaken in order to reach the fair value of USI. Not surprisingly, Richman concluded that his calculated value for USI required a 15 percent minority or marketability discount before fair value could be stated while Estabrook opined that a 25 percent control premium was necessary for the statutorily mandated value to be reached. This court

ultimately agreed in part and disagreed in part with the analyses and conclusions of both of the parties' experts.

A. *Discounted Cash Flow Analysis*

(i) *Cash Flow Analysis*

At trial, Richman and Estabrook provided the court with exhibits[4] setting out their respective analyses utilizing the DCF methodology. After considering the entirety of the exhibits and the testimony of the experts, the court found Richman's projections generally more credible and decided to work from his DCF model. However, the court agreed with Estabrook on various aspects of his DCF analysis and requested that the experts submit revised exhibits addressing the court's concerns. The court has now integrated these supplemental exhibits, submitted on June 9, 2000,[5] into its analysis and is prepared to value USI by means of a DCF analysis.

In order to accurately assess a company's cash flows for the relevant years, one must project anticipated levels of both income and expenses. Although Richman and Estabrook each predicted growth in both the income and expenses of USI, they sharply disagreed on the levels of such growth. Based upon USI's income growth rate of approximately 20 percent in 1998, Richman assumed a corresponding 20 percent per year income growth rate for the years 1999 through 2003, the years both experts utilized for their cash flow projections. Conversely, Estabrook's assumed income growth rates ranged from 8.08 percent to 13.77 percent depending on the year in question. Although Richman conceded that his assumed growth rate was somewhat aggressive, he credibly testified that the projected revenues, gross profits, and operating expenses in his DCF analysis were accurate estimates of what USI should reasonably have expected as of the applicable December 31, 1998, valuation date. The parties agree that McGreevy's stock must be valued as of December 31, 1998, as the merger was effective that date. See Va. Code § 13.1-729 (defining of fair value). The court therefore accepted Richman's projected revenue growth rate of 20 percent per year for the years 1999 through 2003.

Richman, in his DCF model, also projected 20 percent per year increases in USI's operating expenses. Richman and Estabrook disagreed on a number

---

[4]   Pet. Exh. 1 and Resp. Exh. 1.

[5]   Pet. Exh. 1, 2, 3, 4, & 5 and Resp. Exh. 1, 2, & 3.

of issues relating to Richman's operating expense projections. The court will address the major areas of disagreement.

### (1) *Cendant Expense*

In December 1997, Radonics entered into a Preferred Alliance Agreement with Cendant Corporation, whereby Cendant contracted to promote Radonics' inspection services from December 1997 through December 2003, by way of its subsidiaries in the relocation and time-sharing industries. In exchange, Radonics agreed to make payments to Cendant, including a $500,000 payment in 1997 and a $904,000 payment in 1998. Although Radonics' independent auditors, KPMG Peat Marwick, L.L.P., expensed these payments in 1997 and 1998, Richman testified it would be more appropriate to amortize this expense over the life of the contract. Both Estabrook and this court agreed. Nevertheless, in his original DCF analysis[6] Richman expensed out these payments in 1997 and 1998 and then added them back in as adjustments to his pretax income figures. Estabrook contended that Richman's methodology of first expensing out and then adding back these Cendant expenses as an adjustment to income artificially increased the projected expenses of USI in the relevant years, thereby reducing the value of the company. In an exhibit prepared for the court during the trial,[7] Estabrook provided differing calculations of value depending on how these Cendant payments were expensed. Ultimately, on cross-examination, Richman conceded that Estabrook's treatment of the Cendant expense, on page three of his exhibit, was just as reasonable as his own. On this issue, the court found Estabrook's analysis more credible and ultimately decided to amortize the Cendant expense over the years 1998 through 2003.

Additionally, Estabrook challenged Richman's consideration of the Cendant expense on a second basis. In his DCF analysis, Richman had incorporated the Cendant expense into the total operating expenses of USI, which were projected to increase by 20 percent each year. As the actual Cendant expense was simply to be amortized over the six-year period, Estabrook claimed that this expense would obviously not increase over the relevant years and it was therefore unreasonable to include this expense with the other operating expenses that were calculated to grow each year. Again, the court found Estabrook's reasoning more persuasive and required the parties to provide supplemental DCF models segregating the Cendant

---

[6]  Pet. Exh. 1 (Exh. 3).

[7]  Resp. Exh. 16.

expense from the other expenses that were to increase each year. The parties integrated this change into the Exhibits provided to the court on June 9, 2000. See *supra*.

### (2) *Level of Projected Increases in Operating Expenses*

In addition to the Cendant expense issue, Estabrook raised other questions concerning Richman's projected expense increases over the relevant years. Estabrook accused Richman of treating all expenses identically and projecting 20 percent per year increases for the entirety of the expenses, when, in fact, some expenses would increase over the years while others, such as rent, were already fixed. According to Estabrook, these other fixed expenses should be treated identically to the way the court determined to treat the fixed Cendant expense. Richman responded that almost all expenses, including rent for the corporation's offices, would increase as the corporation's revenue grew and it would be unfair to utilize an aggressive growth rate for revenue without utilizing an equally aggressive rate for projected expenses. After consideration of all the evidence presented, the court decided to accept Richman's position on this issue for a number of reasons. First, the court agrees that it would be inequitable to project expenses in the DCF analysis more conservatively than revenue. Second, in projecting USI's expenses for the period 1999 to 2003, Richman utilized the weighted average of Radonics' expense to sale ratios for 1996 to 1998 (41.51 percent) when he could easily have utilized solely the 1998 figure (43.08 percent), thereby driving up the projected expenses for the relevant years. Third, the credible evidence at trial supported Richman's view that Estabrook was significantly overstating the percentage of expenses that could remain fixed over the relevant years. For example, this court found credible the testimony of USI's officers that facilities would have to be expanded as the company continued to grow and that referral fees, such as the Cendant expense, were being paid and would have to be paid to other companies to sustain the growth level utilized by Richman. Here, the court finds Richman's position more persuasive and accepts his growth projections for the non-Cendant related expenses.

### (3) *Tax Rates*

In determining the net cash flows to be projected, the experts agreed that the company's pre-tax income must be reduced by the taxes to be paid on the company's income. Estabrook utilized an effective tax rate of 37.96 percent in his DCF analysis. However, no credible explanation was offered as to how

Estabrook computed this effective tax rate. Conversely, in his DCF analysis, Richman chose an effective tax rate of 40 percent. Jeffrey Simpson, USI's chief financial officer, testified that the actual tax rate for the company was 43.5 percent. As Richman's proposed tax rate is closer to Radonics' actual rate, the court accepts Richman's proposed tax rate.

### (4) *Stock Appreciation Rights Plan*

In December 1995, the Board of Directors of Radonics established a Stock Appreciation Rights Plan (SAR Plan). See Resp. Exh. 4(A) at 10. Pursuant to the SAR Plan, key employees of the company could be awarded stock appreciation rights in the form of performance shares. Although no shares were to be transferred to the employees, cash payments equal to the value of the performance shares would be paid to the employees. The value of the performance shares would equal the difference between the *fair market value* of the performance share, at the time of issuance, and the fair market value of a share of Radonics' common stock as of December 31st of the prior year. However, the Board of Directors of Radonics, in its sole discretion, would determine the fair market value of the stock at the relevant times.

Richman testified that he had already incorporated the 1997 and 1998 SAR Plan expenses into his DCF model. However, according to Richman, if the court ultimately determined that the value of a share of USI, as of December 31, 1998, was higher than the Board of Directors had determined, an additional expense for this company plan would have to be calculated and projected out through the relevant years. The court rejects Richman's analysis. This court must calculate the *fair value* of USI, not its *fair market value*. Moreover, the fair market value determination to be made under the SAR Plan is solely within the discretion of the Board of Directors. According to Brian Fimian, President and CEO of USI, the Board established a value of $0.71 per performance share as of December 31, 1998. This per share value, however, included a fifty percent private company reduction. As will be discussed later in this opinion, while such a discount may be appropriate in determining the *fair market value* of a minority interest in a non-publicly traded corporation, no such discount is appropriate in determining the *fair value* of the stock of USI in this statutory proceeding. The Board of Directors of USI is neither legally nor morally required to comport their SAR Plan stock valuations to the per share value reached by the court in this case. Therefore, the court declines to consider any additional proposed SAR Plan expense in its DCF analysis.

### (ii) *Present Value Calculation*

Having determined the projected revenues and expenses to be utilized in its DCF analysis, the court must now determine the present value of the relevant years' cash flows and the terminal value of USI in 2004. To achieve that goal, the values obtained must be discounted back to December 31, 1998, to calculate USI's value as of that date. To obtain these present value figures, the projected cash flows and terminal value must be multiplied by a present value factor (PV factor). Again, the experts disagreed on how to utilize a PV factor under the circumstances of this case. Richman utilized a PV factor of 18 percent but calculated his cash flows as if they would be received in the last month of each year. Conversely, Estabrook chose a PV factor of 19.80 percent but calculated his cash flows by the so-called "mid-year convention," wherein it is hypothetically assumed that all sums will be received in the middle of the relevant year. The present values of the cash flows obviously increase the earlier they are received in a given year.

The concept of a mid-year convention was embraced by the Court of Chancery of Delaware in *Kleinwort Benson, Ltd. v. Silgan*, No. CIV.A. 11107, 1995 WL 376911 (Del. Ch. June 15, 1995). The chancellor in *Kleinwort* reasoned that utilizing an assumed mid-year receipt of cash flow serves as a "surrogate for receipts occurring over the course of the year." This court finds the *Kleinwort* court's reasoning logical and persuasive. Richman seemingly recognized as much, when, in response to this court's request to Richman to recalculate his cash flows and terminal value by use of the mid-year convention, he provided revised figures based upon purported cash flows on a monthly basis throughout each relevant year. Such an approach, even if recognized in the appraisal field,[8] is not consistent with the evidence in this case, as the inspection service component of USI's business, its major revenue source, is slowest in the earliest months of the year. Accordingly, this court elects to utilize Richman's 18 percent PV factor but to calculate it based upon Estabrook's mid-year convention analysis.

### (iii) *Final Discounted Cash Flow Valuation*

After a thorough consideration of the evidence, the opinions of the parties' experts, the arguments of counsel, and the applicable authorities, this court adopts the calculations set out in Respondent's June 9, 2000, Exhibit 1.

---

[8] Petitioner presented no such authority.

Accordingly, this court concludes that USI's value under the DCF methodology was $12,587,735 as of December 31, 1998.

## B. *The Parties' Proposed Adjustments to the DCF Valuation*

Both USI and McGreevy argue that the court's determination of value, arising from its DCF analysis, must be adjusted in order to determine the actual fair value of McGreevy's stock. USI asserts that the court must discount the value of McGreevy's stock for two reasons: (1) she owns a very small minority interest in the corporation (minority discount); and (2) her stock cannot be easily sold because (i) there is no market for the stock of this closely-held corporation, and (ii) costs for attorney's and accountant's fees will necessarily arise from the sale (marketability discount). McGreevy responds that neither the applicable authorities, nor the evidence introduced at trial, support either a minority or marketability discount in this case. To the contrary, McGreevy asserts that the determination of fair value in this case requires the addition of a premium to the stated value because ownership of USI as an entity allows the controlling shareholders to undertake corporate acts that can benefit them individually (control premium).

Whether to impose a minority discount, a marketability discount, and/or a control premium to the value of stock in a dissenting shareholder case appear to be issues of first impression in the Commonwealth. Courts in other jurisdictions, however, have considered the application of such discounts and premiums in this context. This court will analyze the propriety of utilizing a minority discount, a marketability discount, and a control premium under the circumstances of this case.

### (i) *Discounts to Value*

The Supreme Court of New Jersey recently opined that "equitable" considerations have led the majority of states and commentators to conclude that marketability and minority discounts should not be applied when determining the fair value of dissenting shareholder's stock in an appraisal action. See *Lawson*, 734 A.2d at 748. The court will analyze each of these proposed discounts separately.

### (1) *Minority Discount*

The imposition of a minority discount appears to have "been rejected in a substantial majority of ... jurisdictions." *Friedman v. Beway Realty Corp.*, 87 N.Y.2d 161, 661 N.E.2d 972, 977 and n. 2, 638 N.Y.S.2d 399 (N.Y. 1995).

The American Law Institute, in its *Principles of Corporate Governance*, has also rejected use of such a discount in this setting. See 2 A.L.I., *Principles of Corporate Governance*, § 7.22 (1994). A review of some of the leading cases rejecting minority discounts is instructive.

In *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137 (Del. 1989), the Delaware Supreme Court reviewed a trial court's refusal to apply a minority discount in a dissenting shareholder case. In *Cavalier Oil*, as here, the corporation contended that the shareholder's stock interest was *de minimis* and, therefore, its value should be discounted because a prospective purchaser would be less likely to purchase a minority interest in such an entity. The trial court refused to apply such a discount and the Delaware Supreme Court affirmed.

> To this end *the company must be first valued as an operating entity by application of traditional value factors, weighted as required,* but without regard to post-merger events or other possible business combinations. See *Bell v. Kirby Lumber Corp.*, 413 A.2d 137 (Del. Super. Ct. 1980). *The dissenting shareholder's proportionate interest is determined only after the company as an entity has been valued. In that determination, the Court of Chancery is not required to apply further weighting factors at the shareholder level, such as discounts to minority shares for asserted lack of marketability.*

364 A.2d at 1144 (emphasis added).

The Supreme Judicial Court of Maine has also rejected the use of minority discounts in this context for reasons that are no less compelling under Virginia's dissenting shareholders statutory scheme.

> Especially in fixing the appraisal remedy in a close corporation, the relevant inquiry is what is the highest price a single buyer would reasonably pay for the whole enterprise, not what a willing buyer and a willing seller would bargain out as the sales price of a dissenting shareholder's shares in a hypothetical market transaction. Any rule of law that gave the shareholders less than their proportionate share of the whole firm's fair value would produce a transfer of wealth from the minority shareholders to the shareholders in control. Such a rule would inevitably encourage corporate squeeze-outs.

*In re McLoon Oil Co.*, 565 A.2d 997 (Me. 1989).

This Court believes the concept of a minority discount is better suited to the sale of stock between a willing seller and a willing buyer on the open

market, than to a statutorily mandated buy-out of a dissenting shareholder's interest in a corporation. *McLoon*, 565 A.2d at 1004. When states throughout the country enacted these statutory schemes, shareholders were statutorily granted fair value, not fair market value, for their shares in exchange for the loss of their veto power over extraordinary corporate actions. *McLoon*, 565 A.2d at 1004. In this court's view, imposition of a discount to the shares of a minority shareholder would be inconsistent with calculating fair value as a proportionate interest in a going concern. See *McLoon*, 565 A.2d at 1007; see also *Camino, Inc. v. Wilson*, 59 F. Supp. 2d 962 (D. Neb. 1999).

Moreover, as the Court of Appeals of New York noted in *Friedman v. Beway Reality Corp.*, imposition of a minority discount would necessarily result in minority shares being valued lower than majority shares, in contravention of the clear intent of New York's dissenting shareholder statutory scheme. *Friedman v. Beway*, 661 N.E.2d at 976. The Virginia Supreme Court has also stated that "It is inconceivable, we think, that the legislature ever intended that dissenting stockholders of the same corporation and of the same class should receive different value for their shares." *Adams*, 184 Va. at 146.

USI's own expert, Anatole Richman, also seemingly recognized that a minority discount should not be applied in a proceeding under § 13.1-740 of the Virginia Code when at trial he all but abandoned the inclusion of a minority discount in his valuation of McGreevy's shares. This court therefore finds that no minority discount should be applied in determining the fair value of shares in a proceeding under § 13.1-740.

### (2) *Marketability Discount*

USI also argues that the court must factor a marketability discount into its calculation of fair value. It contends such a discount is based upon the lack of a market for the shares of this closely held corporation and the costs that will necessarily arise from the sale of McGreevy's stock. Although it appears that more courts have been willing to consider marketability discounts than minority discounts,[9] this court agrees with those courts that generally reject the application of such a discount at the shareholder level. See *Paskill*, 747 A.2d at 557 (holding application of marketability discount at shareholder level would have been improper); *Lawson*, 734 A.2d at 749 (concluding that

---

[9] See *WCM Industries, Inc. v. Wilson*, 948 P.2d 36, 39 (Col. App. 1997) (finding marketability discount not required as a matter of law but acceptable based upon specific facts and circumstances of case).

marketability discounts "generally should not be applied when determining the 'fair value' of dissenters' shares in a statutory appraisal action"); *McLoon*, 565 A.2d at 1004 (ruling use of marketability discount inconsistent with statutory appraisal remedy).

In this court's view, application of a marketability discount, absent the existence of unusual circumstances affecting the value of the corporation as a whole, would again be inconsistent with a determination of fair value based upon a dissenting shareholder's proportionate interest in an ongoing concern. See *Cavalier*, 564 A.2d at 1141. The same policy considerations that have led most courts to reject application of a minority discount apply equally to a marketability discount. Dissenting shareholders would receive less than their proportionate share of the entire firm's value, thereby transferring wealth from these shareholders to those in control. *McLoon*, 565 A.2d at 1025. Controlling shareholders in non-publicly traded corporations would be given an added incentive to consider corporate actions that would lead to corporate buyouts. *Lawson*, 734 A.2d at 749. Dissenting shareholders could be penalized for having to exercise their statutory rights. *Dreiseszun v. FLM Indus., Inc.*, 577 S.W.2d 902, 904 (Mo. 1979). Such potential results would be entirely inconsistent with the purposes underlying these statutory schemes, providing an equitable remedy for dissenting shareholders who are statutorily stripped of their veto power over extraordinary corporate transactions. *McLoon*, 565 A.2d at 1004. As one commentator has stated, "it is incongruous for the majority shareholder to oppress the minority shareholders, or to control the timing of a valuation by voting on a merger, and then obtain the benefit of a discount at the minority shareholders' expense." Robert F. Reilly & Robert P. Schweihs, *Handbook of Advanced Business Valuation*, 303 and n. 44 (2000).

In addition, this court finds Richman's stated bases for the application of a marketability discount in this case unpersuasive. First, although shares of USI may not now be traded on a public market, the enactment of §§ 13.1-729, *et seq.*, of the Virginia Code created a statutorily mandated market for dissenting shareholders' stock when controlling shareholders decide to take extraordinary corporate action. As the corporation is required to purchase the stock if it elects to take extraordinary action, the statutory scheme itself "create[s] the economic equivalent of a market." Robert F. Reilly & Robert P. Schweihs, *Handbook of Advanced Business Valuation*, 303 and n. 41 (2000). Second, absent a dispute between the parties concerning the fair value of the stock, virtually no attorney's fees or accountant's fees should arise out of the statutory redemption of a dissenting shareholder's stock by the corporation. In the event of such a dispute, § 13.1-741 of the Virginia Code sets forth the

prospective rights of the parties and authorizes recovery of both attorneys' and experts' fees if the dissenting shareholders act in bad faith.

After consideration of the applicable authorities, this court adopts the reasoning of the Delaware, New Jersey, and Maine Supreme Courts that the policies underlying dissenting shareholder statutory schemes are inconsistent with the imposition of marketability discounts, absent extraordinary circumstances. The court finds no extraordinary circumstances present here as McGreevy has simply decided to exercise her statutory rights arising from the controlling shareholders' decision to merge Radonics into USI. Accordingly, this court declines to reduce the value of McGreevy's shares through any marketability discount.

### (3) *Control Premium*

McGreevy argues that the valuation of her shares should be increased by a 25 percent "control premium." The concept of a control premium is premised upon the ability of controlling shareholders to manipulate the finances of a company to their personal advantage by increasing their salaries and benefits, thereby decreasing the value of the company. On brief, McGreevy claimed that "the purpose of applying this adjustment is simply to avoid an inadvertent *minority discount* or to adjust for a valuation of a recognized *minority interest*." Resp. Trial Brief at p. 13. USI responds that neither the Delaware cases relied upon by McGreevy nor the facts of this case support imposition of a control premium. The court agrees with USI.

In support of her argument for the inclusion of a control premium, McGreevy relies on the Delaware Supreme Court's decision in *Rapid-American Corp. v. Harris*, 603 A.2d 796 (Del. 1992), and the Delaware Court of Chancery decisions in *Borruso & Lee v. Communications Telesystems Int'l*, 753 A.2d 451 (Del. Ch. 1999), and *Kleinwort Benson, Ltd. v. Siligan Corp.*, No. CIV.A. 11107, 1995 WL 376911 (Del. Ch. June 15, 1995). McGreevy's reliance on each of these cases is misplaced. Here, McGreevy contends that application of the control premium would avoid an inadvertent minority discount or adjust for a recognized minority interest. However, as set out above, this court has explicitly rejected application of any minority discount. Moreover, any adjustment for a "recognized minority interest" would be inconsistent with the basic principle underlying each of the Delaware cases. Any adjustments are to be made at the corporate level — rather than at the shareholder level — as the shareholder's interest is to be calculated based upon the shareholder's proportionate interest in the value of the entire corporation. See *Rapid American*, 603 A.2d at 806. In *Rapid American*, the Delaware Supreme Court found fault in the trial court's failure

to consider a control premium at the *corporate level* based upon the corporation's 100 percent ownership interest in three valuable operating subsidiaries. The Court reasoned that "Rapid's 100 percent ownership interest in its subsidiaries was clearly a 'relevant' valuation factor. ..." 603 A.2d at 806. As McGreevy urges this court to apply a control premium at the shareholder level to a corporation that owns no operating subsidiaries, *Rapid American* is clearly inapposite. See also *M. G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513 (Del. 1999) (upholding addition of control premium to valuation of holding company based upon majority ownership of subsidiaries).

The Court of Chancery's decision in *Borruso & Lee v. Communications Telesystems Int'l*, 753 A.2d 451 (Del. Ch. 1999), can also be easily distinguished. There, the court utilized the comparable company method of valuation which the court found produced a valuation "that inherently reflects a minority discount." 753 A.2d at 458. As this court does not utilize the comparable company methodology in valuing USI, *Borruso* is also inapposite.

Similarly, in *Kleinwort Benson, Ltd. v. Silgan, Corp.*, the Court of Chancery discussed utilization of a control premium in a valuation process utilizing a non-income-based methodology. In *Kleinwort*, the chancellor considered one expert's analysis of the company's value based upon the market price for its publicly traded stock. Consistent with Richman's testimony herein, the judge found that the market price for publicly traded stock includes an imbedded minority discount. Hence, when utilizing this methodology, a premium adjustment to offset this imbedded discount was deemed appropriate. See *Kleinwort Benson, Ltd. v. Siligan Corp.*, No. CIV.A. 11107, 1995 WL 376911, *3 (Del. Ch. June 15, 1995).

Here, however, the court is valuing USI principally through utilization of the discounted cash flow methodology recommended by the parties' experts Richman and Estabrook. No credible evidence was adduced at trial that the DCF method of valuation includes an implicit minority discount. To the contrary, Richman testified credibly that his DCF model did not produce a minority valuation. Moreover, in the case of *In re Radiology Assoc.*, 611 A.2d 485 (Del. Ch. 1991), the Court of Chancery of New Castle, Delaware, explicitly rejected an upward adjustment of a DCF valuation in the context of a statutory appraisal action, finding that the DCF analysis fully reflected the value of the shareholder's proportionate interest in the company. 611 A.2d at 494. This court finds the Delaware court's reasoning persuasive.

In addition, the evidence presented in this case belies any claim that USI is undervalued because of a manipulation of the company's finances by the controlling shareholders. To the contrary, the evidence was clear that no such

self-dealing had been undertaken. After a thorough investigation of the company's expenditures during the relevant period, Estabrook could not point out any instance of excessive salaries, bonuses, benefits, or other payments being paid to the directors or controlling shareholders. Nor did the audited year-end statements of Peat Marwick, the corporation's accountants, note any such excessive expenditures. In fact, the evidence established that frugality was the rule in this corporation. Directors drove their cars from Virginia to meetings in Connecticut and when they did travel by plane, they often drove to Baltimore-Washington International Airport to avail themselves of the lowest possible airline ticket prices. This court rejects any notion that the present controlling shareholders of this corporation have devalued the company through payments of unreasonable compensation or benefits or that a prospective purchaser of USI would be willing to pay a premium for the ability to manipulate the finances of this company to the purchaser's advantage. Hence, this court declines to include any control premium or adjustment to its calculation of USI's fair value.

## IV. *Capitalization of Earnings Approach*

Richman's second valuation method, which was again income based, determined value through capitalization of Radonics' earnings for the years 1996 to 1998. In the capitalization of earnings approach, the weighted cash flows of a company are divided by a cap rate chosen by the appraiser. The cap rate is derived by adding appropriate risk premiums to a risk-free rate of return, such as U.S. Treasury Bond rates, and then deducting the anticipated growth level of the investment. The logic underlying this methodology centers on the belief that an investor will demand a higher rate of return, the riskier the investment, to compensate for the investor's potential loss of capital.

Richman began the task of selecting an appropriate cap rate by including the 6 percent 30-year U.S. Treasury Bond rate as of December 31, 1998. To that he added (1) an equity risk premium of 6.65 percent (representing the long-term difference between returns on S and P 500 common stocks and long-term treasury bond yield returns), (2) a small stock premium of 3.35 percent based upon the size of Radonics compared to typical S and P companies, and (3) a company specific premium of 2 percent based upon the specific financial characteristics of USI in the marketplace as of December 31, 1998. From that 18 percent investor required rate of return, Richman deducted a 5 percent anticipated long-term growth rate for USI to reach the 13 percent cap rate he utilized in his capitalization of cash flow analysis. He calculated the cash flows for the relevant years as $154,998 for 1996,

$832,717 for 1997, and $1,703,691 for 1998. He weighted the cash flows for these years in calculating his weighted average cash flow of $1,155,251 per year. He next divided the average cash flow by the capitalization rate and calculated the value of USI through this methodology as $8,890,000 as of December 31, 1998. Richman weighted this value equally with his initial DCF valuation of $8,200,000 and found the value of USI to be $8,545,000, before inclusion of any minority or marketability discount.

Estabrook challenged Richman's use of a capitalization of earnings analysis. He argued that a valuation approach based upon the company's financial transactions from 1996 to 1998 was not an accurate barometer of the company's true value because those years were atypical of both the historical performance of the company and any legitimate projection of its future earnings. Estabrook noted that Radonics had experienced a growth rate of thirty-to-forty percent per year and had acquired other companies, including R. J. Moore and Associates, during this time frame. Finally, during these years, Radonics had entered into long-term contracts with both Cendant Corporation and Prudential Resources Management, Inc. The services provided pursuant to these two contracts constituted approximately 80 percent of USI's total business.

Clearly major transactions and company growth occurred between 1996 and 1998 that could potentially affect the accuracy of a valuation of the company by means of the capitalization of earnings methodology. As a result, the court found the DCF methodology substantially more reliable. Hence, the court rejects Richman's proposed equal weighting of the DCF and capitalization of earnings approaches. However, the court does consider Richman's capitalization of earnings model in the court's overall valuation analysis.

## V. *Market Approach*

Having rejected the capitalization of earnings approach, Estabrook chose the market approach as his second mode of valuing USI. This approach determines value by comparing the subject to similar businesses, ownership interests, or securities that have been sold. Adjustments are made to the data from the sales of the "comparable" properties to establish value for the subject property.

Estabrook chose six companies within the real estate services industry that he found sufficiently similar to USI to constitute comparables. They were ABM Industries, Inc., Building One Services Corp., Ecolab, Inc., Group Maintenance America Corp., Rollins, Inc., and ServiceMaster Co. Estabrook analyzed historical data from these companies as of December 31, 1998, and

adjusted that data by means of a regression analysis based on (1) price to revenue to net income to sales, (2) price to revenue to earnings before interest taxes depreciation to sales, and (3) price to book value. He then adjusted his regression analysis results from the comparables for size and applied them to USI data to determine a value for USI. He thus concluded that USI had a value of $19,931,986 as of December 31, 1998, pursuant to this methodology.

Richman responded that Estabrook's market approach was flawed because it was premised upon the misconception that the six comparable companies chosen by Estabrook were true comparables. On this issue, the court agrees with Richman. Notwithstanding Estabrook's attempts to link USI to his chosen comparables, the court finds these companies have almost no similarity to USI for a number of reasons. First, each of the six companies has its stock traded on a public exchange. To the contrary, USI is a closely held corporation whose outstanding shares are owned by less than fifteen people. As of December 31, 1998, USI employed approximately 300 individuals. On the same date, Service Master employed 45,000 people, Ecolab employed 10,000, and Rollins employed 8,934. Moreover, in 1998 Radonics' net sales totaled approximately 25 million dollars. That same year, ADM Industries' net sales were 1.5 billion, Building One's totaled in excess of 809 million, Ecolob's approximated 1.9 billion, Maintenance America's exceeded 760 million, Rollins' fell just short of 550 million, and ServiceMaster's exceeded 4.7 billion. Nor was there true comparability in the types of services provided by USI and Estabrook's chosen comparables. None of ABM Industries, Building One Services, or Group Maintenance America provide home inspection services, which constitute the vast majority of USI's business. Ecolab provides various services to its customers, none of which are supplied by USI. Rollins primarily provides pest control services to its customers, while USI provides no such services. And, although ServiceMaster does provide home inspection services, Estabrook was unable to provide any estimate of how much of ServiceMaster's total business its home inspection division provides. For other substantial differences, see Exhibit 7 to Estabrook's report and Respondent's Exhibit 1.

Even more troubling to the court was the disparity between Estabrook's valuation utilizing the market approach and his valuation arising from his DCF analysis. Ideally, business valuations should be close to equal, notwithstanding the methodologies chosen. Nonetheless, Estabrook's market valuation was approximately 50 percent higher than his DCF valuation of USI. On cross-examination, Estabrook attempted to minimize the importance of this substantial disparity. His failure to credibly address this issue undermined the court's view of Estabrook's overall credibility. Ultimately, the court agreed with Richman that the substantial differences between USI

and Estabrook's chosen companies rendered them inappropriate as comparables for a market approach analysis. Consequently, this court gives no weight to Estabrook's market approach analysis.

## VI. *Miscellaneous Valuation Factors*

### (A) *Stock Options Payments*

As of December 31, 1998, USI had granted 1,772,500 stock options to individuals affiliated with the company. 1,510,000 of those options had vested. To exercise their vested stock options, the individuals holding the options would be required to pay USI $700,120. Estabrook opined at trial that if the court were to consider these options in determining the number of shares of USI outstanding as of December 31, 1998, this sum would have to be added to the court's valuation to determine the corporation's true value. Richman responded that it would not be appropriate to consider this sum because the court had chosen an income based method for valuing USI and the inclusion of the $700,120 would inappropriately mix the income based approach with the net asset valuation method. The court again agrees with Richman.

The net asset approach to valuation is premised upon a company's value equaling the depreciated value of its assets minus its liabilities. The net asset approach is generally utilized when (1) a company owns significant tangible assets, (2) little value is added to the company by the labor of its employees, and (3) the earnings of the company provide an insufficient basis to determine value. See Pet. Exh. 1 at 11. USI is a services related company whose net asset value, as of December 31, 1998, approximated only $1,000,000. See Pet. Exh. 1 at 8. As a result, both Richman and Estabrook rejected the net asset methodology for valuing USI. Hence, this court finds it would not be appropriate to increase the income-based valuation of USI because of the addition of an additional asset. The court thus declines to consider this factor in its valuation analysis.

### (B) *John McGreevy's Sale of Radonics' Stock in 1998*

Respondent's husband, John McGreevy, was one of the founders of Radonics in the mid-1980's. Disputes arose between Mr. McGreevy and his co-founders, Brian and Keith Fimian, who owned over 60 percent of the stock of Radonics. As a result, Mr. McGreevy was no longer actively involved in the every day operation of the company at the time of Radonics' merger with USI. In 1994 and 1995, Radonics set up valuation procedures to,

in part, provide a mechanism to buy out Mr. McGreevy's approximately 16 percent interest in the company. In fact, Mr. McGreevy sold some of his stock to the company in 1995 and sold an additional approximately 290,000 shares in Radonics in April 1998, at a price of $0.56 per share. Although USI, both on brief and in its evidence, raised the issue of Mr. McGreevy's 1998 sale of stock at $0.56 per share, Mrs. McGreevy presented no evidence explaining why Mr. McGreevy was then willing to sell a portion of his stock to the company for approximately 25 percent of what she now contends the stock was in fact worth.

The court is fully aware that the value of Mr. McGreevy's stock would be subject to the minority and marketability discounts that the court has rejected in this statutory valuation proceeding. Nonetheless, in view of Mr. McGreevy's history with and knowledge of Radonics and its financial and business affairs, the court believes it appropriate to consider the April 1998 stock sale as a secondary factor in its valuation analysis. See *Weinberger*, 457 A.2d at 713 ("Fair price obviously requires consideration of all relevant factors involving the value of a company.").

## VII. *Conclusion*

After full consideration of all of the factors affecting the value of USI, this court finds the value of U.S. Inspect as of December 31, 1998, was $11,750,000. When this total company value is divided by 10,775,615, representing the number of outstanding shares and vested options then existing, the value per share of stock equals approximately $1.09 per share. Accordingly, pursuant to Va. Code § 13.1-740, this court finds $125,980.72 to be the fair value of Respondent Noris McGreevy's 115,533.6 shares of USI, as of December 31, 1998.

Under the statutory scheme, the court must also award interest to McGreevy. Interest is defined in § 13.1-729 of the Virginia Code as "the average rate currently paid by the corporation on its principal bank loans, or, if none, at a rate that is fair and equitable under all the circumstances." No evidence was introduced at trial setting forth the interest rate paid by USI on its principal bank loans. Hence, this court will have to determine a fair and equitable interest rate. In the March 5, 1999, letter accompanying its § 13.1-737 payment, USI utilized a 4.60 percent interest rate, based upon the Wall Street Journal's one month CD rate. See Pet. Exh. 12. In his report, Estabrook reported the prime rate existing on December 31, 1998, was 7.75 percent. Based upon this evidence, the court considers an interest rate of 7 percent *per annum* "fair and equitable under all the circumstances" of this

case. Interest shall accrue at that rate as of December 31, 1998, the effective date of the merger. See Va. Code Ann. § 13.1-729.

USI paid McGreevy the sum of $82,700.84 on March 5, 1999. Accrued interest through that date totaled $1546.28. Judgment is therefore entered in favor of Respondent Noris McGreevy against Petitioner U.S. Inspect, Inc., in the principal sum of $44,826.16 plus interest at 7 percent *per annum* from March 6, 1999, until paid. The parties stipulated at trial that no additional sums should be awarded pursuant to Va. Code § 13.1-741, as both parties had acted in good faith.