BENTON, J.
Kenneth E. Batur appeals a circuit court order insofar as it dismisses with preju *988 dice, under section 607.07401, Florida Statutes (2002), the derivative claims he filed, as a shareholder of Signature Properties of Northwest Florida, Inc. (Signature), against South Walton Properties, L.L.C. (South Walton) and Sandpiper Ventures, L.L.C. (Sandpiper).[1] We have jurisdiction[2] to the extent the order finally dismisses all claims against South Walton, Sandpiper, and First National Bank & Trust (First National),[3] see Fla. R.App. P. 9.110(k)(2005), even though claims filed by and against William H. Smith, Mr. Batur’s former business associate, remain pending in the trial court. To the extent the circuit court’s order is a partial, final judgment dismissing South Walton and Sandpiper, we reverse and' remand for further proceedings.
I.
Incorporated in Florida in 1998, Signature engaged in various real estate ventures in south Walton County. Messrs. Smith and Batur, who each own half of Signature’s stock, are its only directors and officers: Mr. Batur is Signature’s president and treasurer, Mr. Smith its yice president and secretary. Pursuant to section 607.1435, Florida Statutes (2002), Mr. Smith petitioned for appointment of a provisional corporate director, alleging he had to bear “the financial and time burdens associated with the management and operation of the Company as a result of Batur’s de facto abandonment of the Company.”
A week later, Mr. Batur sued in turn. In addition to moving for appointment of a custodian for Signature pendente lite, under section 607.1431(3), Florida Statutes (2002), and seeking an inspection of Signature’s records, under section 607.1604, Florida Statutes (2002), Mr. Batur sought an accounting and dissolution of the corporation pursuant to subsections 607.1430(2) and (3), Florida Statutes (2002), alleging that Mr. Smith had breached fiduciary duties in converting corporate property to his own use. The trial court consolidated the cases, appointed a custodian pendente lite, and ordered the custodian to make all corporate records available to Mr. Batur.
In due course, Mr. Batur filed a verified, corrected, third amended complaint (complaint) that included a demand for corporate action under section 607.07401(2), Florida Statutes (2002), and stated various derivative claims. In particular,[4] the com *989 plaint alleges that Signature was the rightful owner of a penthouse condominium, Unit B-1107 at the Majestic Sun Condominiums in Destín, but that Mr. Smith executed a deed on December 26, 2001, conveying title to Unit B-1107, then worth $1,100,000.00, to Coastal Builders of NW Florida, Inc., (Coastal), the very day Coastal conveyed Unit B-1107 to appellee South Walton, a limited liability company of which Mr. Smith is the managing member. In this way, Count VI alleges, Mr. Smith converted the penthouse to his own use in “knowing, willful, [and] intentional ... disregard” of Signature’s rights, and the rights of Mr. Batur.
Count VIII alleges that “by actual or constructive fraud, misrepresentations, abuse of confidence, unconscionable conduct, artifice, concealment, deceit, sham conveyance, breach of fiduciary duties, theft, or other questionable means,” Mr. Smith and South Walton obtained title to Unit B-1107 in the name of South Walton; that they continue inequitably to withhold the title from Signature; and that they will be unjustly enriched, if Signature does not recover title. Count VIII seeks imposition of a constructive trust, and a declaration that South Walton holds title to Unit B-1107 solely as trustee for Signature, possessing “no other right, title or interest thereto.”
Count IX states Mr. Batur’s shareholder derivative claim for quiet title as to Unit B-1107 against Mr. Smith, South Walton, Sandpiper and First National. Among other things, Count IX alleges, South Walton and Sandpiper once gave First National, without Signature’s or Mr. Batur’s consent, a million-dollar mortgage on Unit B-1107.[5] Count IX proceeds on the theory that, by co-signing the mortgage, Sandpiper necessarily implied it had an interest of some kind in Unit B-1107. Count IX asks for a declaration that Sandpiper has, in fact, no interest in Unit B-1107, recorded or otherwise, and seeks to remove any cloud on the title attributable to First National’s mortgage.
II.
Supplementing its initial order of appointment and conferring broad powers on the custodian, the trial court entered an order pursuant to section 607.1432, Florida Statutes (2002), that provided,[6] in pertinent part:
2) The Custodian shall take all actions he deems reasonably necessary to preserve, protect, operate, manage and control the assets and property of Signature. The “assets and property of Signature” are defined to include all property rights of Signature at any time from on and after the date of incorporation of Signature. These powers shall be exercised in the place and stead of the Board of Directors of Signature and the exercise of said powers shall have the same force and effect as if done in the name of the Board of Directors and the President of Signature.
*990 3) The Custodian shall have the power and authority to sell, lease, encumber or convey any or all assets, including real property, of Signature upon such terms as are reasonable, taking into consideration the value of said assets....
[[Image here]]
7) The Custodian shall complete his investigation with regard to the issues raised by the Respondent in his third amended complaint, and with regard to issues raised by the Petitioner. A written report with regard to the findings of the investigation by the Custodian and a recommended course of action shall be filed with the Court, with copies to all parties, on or before May 20, 2003.
On May 20, 2003, the custodian submitted an eight-page written report of his investigation “setfting] forth the investigation undertaken and the decisions or lack of a decision reached by the Custodian at this time.”
Although the original custodian’s report explained (in a narrative written in the third person) that the custodian had not completed his investigation,[7] the report recounted that he had looked into several of the derivative claims[8] and, with respect to Unit B-1107 at the Majestic Sun Condominiums, specifically reported the following:
The Custodian reviewed the recorded documents relating to the transfer of this Unit. The Custodian talked with Smith, with his counsel, and with Frank Watson,[9] the attorney who handled the transaction.
The transfer of condominium unit B-1107 was from Signature to Coastal Builders of N.W. Florida, Inc., a Florida corporation, who then transferred the property to South Walton Properties, L.L.C., a limited liability company of which Smith was a member. The consideration for the initial transfer was the
*991 completion of improvements to two other unfinished condominium units owned by Signature. The value of these improvements was initially estimated to be $300,000. Coastal Construction was to originally perform these improvements but stated they could not obtain the necessary financing to complete it. The properties were therefore transferred to South Walton Properties, L.L.C. [controlled by Mr. Smith].
.... Since no written consent[10] to the transfer was obtained, however, and since the transfer was a conflict of interest for purposes of Section 607.0832, Florida Statutes, it is the Custodian’s conclusion that Smith should account to Signature for the fair market value of the property conveyed to South Walton Properties, L.L.C. reduced by the [value of] improvements to the two units owned by Signature that were paid by Smith. Various appraisals on Unit B-1107 have been obtained and reviewed. This issue has not been resolved at this time.
The custodian requested, and was granted, an additional 30 days to complete his investigation, and submitted a two-page follow-up report, on July 8, 2003. He reported no further investigation, but did report that he had reached a “global” settlement with Mr. Smith on five issues:
Much time has been spent in negotiation with counsel for Mr. Smith to settle claims alleged by Mr. Batur against Mr. Smith. These claims have been presented to the Custodian by Mr. Batur’s attorney, Mr. Higley. The Custodian has analyzed the claims, reviewed relevant documents, met with various individuals and has decided to settle all claims against Mr. Smith. Mr. Smith has already taken steps to resolve certain matters alleged against him by Mr. Ba-tur prior to this report and settlement. To make Signature Properties whole regarding the issues alleged by Mr. Batur, the Custodian has agreed to a global settlement with Mr. Smith relating to the following matters:
1. Legacy Unit 104
2. Dune Allen House
3. Majestic Sun Unit B 1107
4. Amsouth Bank checks
5. Magnolia Dunes Subdivision, Lot 16. In addition to prior actions taken by Mr. Smith to resolve these issues, the Custodian has agreed to accept an additional $262,500 cash to settle the above issues. A check in this amount, payable to the Clerk of the Court of Walton County has been received and is being held in my possession. The Custodian has agreed that these funds will be paid to the registry of the Court after the Court has approved and accepted this settlement.
Inasmuch as the report went on to explain that the custodian had hired an independent forensic accountant to review Mr. Ba-tur’s role in the Lake Powell transaction, because Mr. Smith had alleged damage to Signature “in the millions of dollars,” the so-called global settlement was hemispheric at best.
*992 III.
In October of 2003, however, the custodian, acting on behalf of Signature, asked the court to accept the previous summer’s report on investigation, approve the proposed settlement, and (with the exception of the counts for inspection of corporate records, dissolution of the corporation, and recovery of funds) grant the motion to dismiss the complaint: The custodian’s counsel filed his Motion For Acceptance Of Report On Investigation By The Custodian Filed By The Custodian, And Approval of the Settlement Proposed Therein and Motion For Dismissal Of Third Amended Complaint (Corrected) Filed By Kenneth E. Batur With The Exception Of Counts I, III and XI (the compound motion).
At the evidentiary hearing,[11] the custodian reiterated that he had not finished his investigation of all claims. The trial judge asked the parties for their positions on whether a decision could await completion of the custodian’s investigation. Counsel for both parties took the position that the trial court had no choice but to rule up or down[12] on the pending, compound motion.[13] Eventually, on March 19, 2004, the trial judge granted the compound motion, giving rise to this appeal.
IV.
At the outset, we reject Signature’s eleventh-hour suggestion that the trial judge and all parties were proceeding below under the wrong statutory provision. Signature correctly relied below on subsection 607.07401(3), the provision of the Florida Business Corporations Act, § 607.0101 et seq., Fla. Stat. (2002), that permits[14] corporate management[15] to cut short shareholder derivative suits in certain cir- *993 eumstances. The custodian’s counsel cited section 607.07401 in drafting the compound motion and quoted subsection 607.07401(3)’s language in arguing the compound motion.
Subsection 607.07401(3) governs, just as Signature contended below, not subsection 607.07401(4), Florida Statutes (2002). Subsection 607.07401(4) is intended to protect non-party shareholders in cases (unlike the present case) where the plaintiffs in a shareholder derivative action propose to settle (or simply to abandon) the derivative action they initiated. See generally 13 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 6020 (perm, ed., rev. vol. 2004).[16] Mr. Batur was not seeking judicial approval or authorization to settle or discontinue the derivative action he had brought against South Walton and Sandpiper. Subsection 607.07401(4) reads:
A proceeding commenced under this section may not be discontinued or settled without the court’s approval. If the court determines that a proposed discontinuance or settlement will substantially affect the interest of the corporation’s shareholders or a class, series, or voting group of shareholders, the court shall direct that notice be given to the shareholders affected. The court may determine which party or parties to the proceeding shall bear the expense of giving the notice.
§ 607.07401(4), Fla. Stat. (2002). Subsection 607.07401(4) does nothing to relieve the corporation of its burden to prove, inter alia, that a reasonable investigation has taken place, if the corporation seeks dismissal of a derivative suit, over an initiating shareholder’s objection. See § 607.07401(3), Fla. Stat. (2002). While “the ‘tipsy coachman’ doctrine, allows an appellate court to affirm a trial court that ‘reaches the right result, but for the wrong reasons’ so long as ‘there is any basis which would support the judgment in the record,’ ” Robertson v. State, 829 So.2d 901, 906 (Fla.2002), the doctrine has no application here, because subsection 607.07401(4) does not apply here.
Signature’s argument, made for the first time on appeal,[17] that subsection *994 607.07401(4), rather than subsection 607.07401(3), can be deemed controlling is untimely and unsound. See generally Dade County Sch. Bd. v. Radio Station WQBA, 731 So.2d 638, 644 (Fla.1999) (“Generally, if a claim is not raised in the trial court, it will not be considered on appeal.”)- Signature made no mention whatsoever of subsection 607.07401(4) in the proceedings below.
V.
We turn then to the plain language[18] of section 607.07401(3), Florida Statutes (2002), which provides:
The court may dismiss a derivative proceeding if, on motion by the corporation, the court finds that one of the groups specified below has made a determination in good faith after conducting a reasonable investigation upon which its conclusions are based that the maintenance of the derivative suit is not in the best interests of the corporation. The corporation shall have the burden of proving the independence [19] and good faith [20] of the group making the determination and the reasonableness of the investigation. ...
[[Image here]]
(c) A panel of one or more independent persons appointed by the court upon motion by the corporation.
§ 607.07401(3), Fla. Stat. (2002) (emphasis supplied). Nobody contends that an independent custodian cannot serve as the “panel.”
Ordinarily, “ ‘[w]hether a complaint [or part thereof] should be dismissed is a question of law.’ City of Gainesville v. State, Dep’t of Transp., 778 So.2d 519, 522 (Fla. 1st DCA 2001). ‘A trial court’s ruling on a motion to dismiss based on a question of law is subject to de novo review.’ Execu-Tech Bus. Sys., Inc. *995 v. New Oji Paper Co., 752 So.2d 582, 584 (Fla.2000).” Rudloe v. Karl, 899 So.2d 1161, 1162 (Fla. 1st DCA 2005); State v. Wyndham Int’l, Inc., 869 So.2d 592, 596 (Fla. 1st DCA 2004).
But dismissals of shareholder derivative actions may, as here, entail “an evidentiary hearing with respect to the disputed issues of bias, conflict of interest, objectivity and reasonableness in the preparation and presentation of the report” (or, under, section 607.07401(3) the conduct itself) of the investigation that the statute requires before allowing a corporation to scuttle a shareholder’s derivative action. De Moya v. Fernandez, 559 So.2d 644, 645 (Fla. 4th DCA 1990). “[Mjixed questions of law and fa.ct ... require us to employ a mixed standard of review: we defer to the trial court’s factual findings (to the extent they are supported by competent, substantial evidence), but we review the trial court’s legal conclusions de novo.” Dillbeck v. State, 882 So.2d 969, 972-73 (Fla.2004).
At issue is whether Signature proved the custodian’s independence and good faith, and established that the custodian’s investigation met the statutory requirement of reasonableness. Absent “the protection of a summary judgment proceeding,” De Moya, 559 So.2d at 645, such proof is the necessary precondition[21] for dismissing shareholder derivative claims against South Walton and Sandpiper, over Mr. Batur’s objection. The plaintiff whose derivative action is to be dismissed on the corporation’s motion is entitled to more than assurances that management’s negotiating prowess has led to a desirable outcome.[22]
To the extent the trial court found as a fact that the custodian was independent, competent substantial evidence supports the finding. To the extent the trial court concluded as a matter of law that the custodian was independent, we find no error. To the extent the trial court found the custodian’s investigation was reasonable as to Unit B-1107 — and in the absence of- detailed findings — we construe the evidence in a light most favorable to the ultimate finding. Even so, as a matter of law, Signature did not prove that the custodian made “a determination in good faith after conducting a reasonable investigation upon which its conclusions are based.” § 607.07401(3), Fla. Stat. (2002).
The custodian stated in his initial report: Mr. “Smith should account to Signature for the fair market value of the property conveyed to South Walton [Unit B-1107] reduced by the [value of] improvements to the two units owned by Signature [1204 and 1205] that were paid by Smith.” We thus begin with the custodian’s own premise.[23] The evidence showed that the cost *996 of the improvements to Units 1204 and 1205 was $268,000.00. Four months after Mr. Smith caused Signature to convey B-1107 (by way of Coastal Properties) to South Walton, Unit B-1107 was appraised (still unfinished) at $1,100,000.00 for purposes of a federally guaranteed loan.[24] Using these figures, Mr. Smith owed Signature $832,000.00, as compared to the $262,500.00 the custodian proposed that he pay. The proof was insufficient to show that “the recommendation to dismiss was objectively reasonable.” De Moya, 559 So.2d at 645.
The custodian did not do a sufficient investigation to determine the market value of Unit B-1107 at the time it was conveyed. He repeatedly testified that he had not ascertained this value (because he felt he had not needed to) saying things like: “I don’t have an exact value of B1107.” He testified it was not necessary to decide upon a value.[25] He also testified:
So in my mind if B1107 was worth a million one, if it was worth 800 grand, if it was worth 300 grand, if Mr. Batur could have bought it for less, it almost didn’t matter what that value was and what we’re saying it’s worth now.
Asked, “At the time of your June 20, 2003 report, what value did you attribute to B1107?” he replied: “I didn’t attribute a specific value to it because I was settling multiple matters.” This is apparently a reference to the other four matters aggregated in the “global” settlement he and Mr. Smith proposed.
Even the most meticulous investigation of the other four claims could not excuse the custodian’s failure to determine the fair market value of Unit B-1107, or to investigate more carefully South Walton’s liability. The custodian made no determination either as to the value of the corporate opportunity lost to Signature, or as to the amount South Walton gained when it acquired Unit B-1107. But the investigation he performed failed to uncover any good reason not to believe that, in Unit B-1107, Signature lost and South Walton gained property worth approximately three quarters of a million dollars, if not nearly twice that. The custodian failed to ask Messrs. Watson and Baranowski key questions, yet proposed to accept as full restitution a drastically discounted sum. Neither the custodian’s written reports nor his testimony at the evidentiary hearing established an adequate or objectively *997 “reasonable investigation upon which [his] conclusions [we]re based.” § 607.07401(3), Fla. Stat. (2002).
VI.
The so-called global settlement approved by the trial court also dealt with issues other than those involving Unit B-1107. The terms of the settlement touching other matters might not have been arrived at, if the custodian and Mr. Smith had been aware that the trial court’s order, insofar as it dismissed the claims against South Walton and Sandpiper, was destined to be overturned on appeal. See generally Fung v. Fla. Joint Underwriters Ass’n, 840 So.2d 1101, 1102-03 (Fla. 3d DCA 2003); Levenson v. Am. Laser Corp., 438 So.2d 179, 182 (Fla. 2d DCA 1983). Because our jurisdiction in this matter is so narrowly circumscribed, any further judicial adjustment to the settlement agreement that may be required at this juncture must come, in the first instance, from the trial court.
VII.
The circuit court order granting the compound motion is reversed insofar as it dismisses the shareholder derivative claims against South Walton and Sandpiper, and the claims are remanded for further proceedings.
ERVIN and KAHN, JJ„ concur.

. The trial court’s order has both appealable and non-appealable components. See generally Stanberry v. Escambia County, 813 So.2d 278, 279 (Fla. 1st DCA 2002) ("Except as to denial of the motion for permanent injunction, we lack jurisdiction.” "Jurisdiction to review a[n] ... order denying an injunction does not confer plenary ... jurisdiction authorizing review of the other matters the ... order addresses.”).

. As in Southland Const., Etc. v. Richeson Corp., 642 So.2d 5, 6-7 (Fla. 5th DCA 1994) (declining to review summary judgment as to one defendant, while exercising "jurisdiction to consider the propriety of the ... summary judgment as to [the other defendant] ... since he is being dropped from the lawsuit as a party”), "[o]ur jurisdiction ... is somewhat complicated and deserves an explanation.” Id. at 6 (emphasis deleted). Under Florida Rule of Appellate Procedure 9.110(k)(2005) ("If a partial final judgment totally disposes of an entire case as to any party, it must be appealed within 30 days of rendition."), Mr. Batur had to "appeal the propriety of dismissing ... as to [South Walton and Sandpiper] or lose ... appeal rights as to” both. Richeson, 642 So.2d at 7.

. Foreclosing any opportunity of relief on appeal as to First National, the initial brief is "addressed solely to that portion of the lower court’s order 'totally disposing of the case as to' South Walton and Sandpiper.” After First National released Unit B-1107 from its mortgage lien, the trial court dismissed the bank as a party.

. Among several other things, the complaint also alleges that Mr. Smith was guilty of civil *989 theft; that he improperly transferred title to Unit 104 in The Legacy at Seagrove Beach, allegedly valued at $750,000.00, from Signature's name to his and his wife Becky's; and that, after a house in the Dune Allen subdivision at Santa Rosa Beach that was rightfully Signature’s was sold for $333,000.00, he "converted to his own use the proceeds of said sale.”

. On October 31, 2003, South Walton, through Mr. Smith and Sandpiper, substituted other collateral for Unit B-1107, according to the appellant. See Appellant’s Initial Brief, 1-2 n. 2.

. The order also imposed a moratorium on discovery in the case, providing:
No discovery shall be undertaken by any party with regard to any matter in this case until the Custodian has submitted his written report to the Court.

. The custodian had not investigated Mr. Smith's claims regarding a real estate transaction involving property at Lake Powell, which was described as perhaps the "most material item between [the] two shareholders.”
He also recommended that nothing be done with regard to the civil theft claims on grounds that the corporate records revealed that Messrs. Smith and Batur
often took actions on behalf of Signature without seeking the written consent of the other shareholder and without documenting the actions by corporate minutes.

. He investigated the house at Dune Allen, concluded it was Signature's asset, and valued it at $313,762.64. He found that Mr. Batur had been aware of the transfer of title to Unit 104 at The Legacy from Signature to Mr. Smith, but that Mr. Smith had, nevertheless, paid the mortgage off, cleared title, and conveyed it back to the corporation. He recommended no further action be taken on that claim. He credited Mr. Smith with $338,014.15 for amounts either expended on behalf of or given to the corporation.

. Mr. Watson handled both the conveyance from Signature to Coastal Builders of N.W. Florida, Inc. (Coastal), and the conveyance from Coastal to South Walton, but the custodian neglected to ask Mr. Watson if the transactions had taken place simultaneously (as the documents suggested). In response to questions posed by appellant's counsel, the custodian testified:
Q. If these conveyances had, in fact, been simultaneous conveyances, would that have changed your position with respect to settling with Smith?
A. You asked me that a while ago and I said yes then and it would have impacted the global [settlement]....
A.If all of this stuff actually happened simultaneously that means Smith would have been lying, Baranowski would have been lying and Frank Watson would have been a party to this corporate fraud.
The deed from Signature to Coastal and the deed from Coastal to South Walton were both executed on December 26, 2001, and recorded on February 19, 2002, according to the documents themselves.

. The custodian reported Mr. Smith's allegation that Mr. Batur orally consented, but expressly refrained from determining the truth or falsity of the allegation:
Smith contended that Batur was aware of the transfer and consented to the transfers. Batur denies this assertion. Mr. Dan Bara-nowski, an employee of Coastal advised the Custodian that he was present in a room where Smith discussed the transfer of B-1107 with Batur during a telephone call. Mr. Baranowski was not a party to the telephone call and was only able to hear Smith's side of the conversation.
The facts are disputed as to whether the transfer was orally approved and the Custodian is not in a position to form a conclusion as to what, if anything, was agreed to by Batur.
The custodian testified he never asked Mr. Baranowski what he heard Mr. Smith say when he was on the telephone.

. Before the compound motion came on for hearing, the court permitted, for the first time, limited discovery concerning the custodian's investigation. See Klein v. FPL Group, Inc., 2003 WL 22768424, at *8-9 (S.D.Fla. Sept.26, 2003) ("recogniz[ing] the need to inquire into the depth of the investigation” to "test the reasonableness of the investigation undertaken”).

. THE COURT: So I really have three [choices]:
Approve, disapprove, or wait until the custodian finishes his investigation of all the issues involved in this case and then make my determination?
MR. HIGLEY: I think at this particular junction, Your Honor, your choices are but two. They are to grant the motion to dismiss, which we say can't be done under the evidence that's in the record. Or B, turn it over to Mr. Batur for prosecution.
THE COURT: Why? Why do I only have that second choice in your opinion if the custodian has clearly indicated from his testimony and his position that he's not completed investigation of all the derivative claims?

. THE COURT: Now, my choices are what? Approve or disapprove?
MR. HOFFMAN: That’s correct, Your Hon- or.
THE COURT: Up or down, right?
MR. HOFFMAN: Up or down, that's correct.
THE COURT: From your position, I don't have the power to substitute my independent business judgment to craft another settlement?
MR. HOFFMAN: That's correct, Judge.
THE COURT: Do you agree with that, Mr. Higley?
MR. HIGLEY: I do, Your Honor.

. The Revised Model Business Corporations Act provides that a court "shall dismiss” a derivative action under specified conditions, whereas section 607.07401(3), Florida Statutes (2002), gives courts more discretion by using the words "may dismiss.” See Klein v. FPL Group, Inc., 2003 WL 22768424, at *6 (S.D.Fla. Sept.26, 2003).

. Here, by order entered in the same proceeding in which the derivative claims were filed, the custodian was charged with managing the corporation pendente lite. Section 607.1432(3)(b), Florida Statutes (2002), defines a custodian's powers as "all of the powers of the corporation, through or in place of its board of directors or officers.” This lan *993 guage, like the language of the trial court’s orders in the present case, confers on the custodian no broader power with respect to derivative suits than the board of directors or the officers themselves enjoy.

. At one time, the plaintiff, after complying with the demand requirement, possessed an independent, individual right to continue a derivative proceeding over objection by the corporation, and could terminate the litigation through voluntary dismissal or settlement, even while the case was pending on appeal. The Model Business Corporation Acts and most states by statute or rules of civil procedure now permit the settlement or discontinuance of a derivative proceeding by the plaintiff only with the approval of the court. This is similar to practice in the federal courts under Rule 23.1 of the Federal Rules of Civil Procedure which provides that a derivative action shall not be dismissed or compromised without the approval of the court.
The requirement of court approval is intended to protect the interests of the other shareholders and prevent the abuse of strike suits by prohibiting derivative plaintiffs, who act in a fiduciary capacity on behalf of other shareholders, from settling with defendants for their own personal interests. It also avoids subsequent litigation on the same claims since court approval of any settlement is binding against the corporation and its shareholders.
13 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 6020 (perm, ed., rev. vol. 2004) (footnotes omitted). See also Hardwicke Cos. v. Freed, 299 So.2d 116, 117 (Fla. 2d DCA 1974).

. We also reject as unsound and untimely Signature’s contention, for the first time on appeal, that the order should be affirmed under the rationale of Adiel v. Elec. Fin. Sys., Inc., 513 So.2d 1347, 1348 (Fla. 3d DCA 1987), because "the evidence shows that ... [Mr. Batur] himself engaged in self-dealing *994 and usurped corporate opportunities.” Answer Brief, at 41. What the evidence showed in this regard is not clear, and the trial court made no finding on the point. No pleading alleged that Mr. Batur had unclean hands, or raised unclean hands as an equitable defense, nor did Signature give any indication that it was asserting such a defense in the trial court.

. While courts "rely with confidence upon Delaware law to construe Florida corporate law,” Int’l Ins. Co. v. Johns, 874 F.2d 1447, 1459 n. 22 (11th Cir.1989) ("The Florida courts have relied upon Delaware corporate law to establish their own corporate doctrines.”); see, e.g., Boettcher v. IMC Mortgage Co., 871 So.2d 1047, 1052 n. 5 (Fla. 2d DCA 2004) (same), Florida courts are tasked with giving statutory language effect without resort to any canon of construction, if possible. See . Holly v. Auld, 450 So.2d 217, 219 (Fla.1984) (quoting A.R. Douglass, Inc. v. McRainey, 102 Fla. 1141, 1144, 137 So. 157, 159 (1931)).

. While appellant's counsel stated at oral argument that he was hot conceding the custodian's independence or his lack of bias, counsel did not clearly raise this issue in the initial brief. The record reflects that the parties agreed to the appointment of the custodian, and that the custodian had no prior connections with either shareholder, with Signature, or with any of Signature’s real estate dealings. See generally Atkins v. Topp Comm, Inc., 874 So.2d 626, 628 (Fla. 4th DCA 2004) (approving an investigation conducted by a retired judge, who had been accepted by both sides and had no ties to either party). Cf. Kloha v. Duda, 226 F.Supp.2d 1342, 1344 (M.D.Fla.2002) (holding corporation’s investigation was not independent because it was conducted by two defendant directors); McDonough v. Americom Int’l Corp., 905 F.Supp. 1016, 1020-1021 (M.D.Fla.1995) (holding investigative committee was not independent since two of its members were corporate directors); De Moya v. Fernandez, 559 So.2d 644, 645 (Fla. 4th DCA 1990) (noting appellant asserted the .receiver and his attorney were not impartial because the receiver was also a defendant).

. Despite shortcomings in the custodian's investigation, we reject appellant's contention that the "record presents evidence of intentionally shallow fact finding, and thus clear evidence of lack of good faith.”

. That the custodian proposes a settlement in conjunction with dismissal of the derivative claims does not alter these requirements. See Electra Inv. Trust PLC v. Crews, 1999 WL 135239, *1 (Del.Ch. Feb.24, 1999). See generally Zapata Corp. v. Maldonado, 430 A.2d 779, 789 (Del.1981) ("If the Court determines either that the committee is not independent or has not shown reasonable bases for its conclusions, or, if the Court is not satisfied for other reasons relating to the process, including but not limited to the good faith of the committee, the Court shall deny the corporation's motion.”).

. At the evidentiary hearing in the present case, the custodian testified:
These guys are offering to do what I was going to get them to do any way, throw cash into the corporation and they did and I got more than they really wanted to pay. And in some of the negotiations I think at one minute, I think they thought walked out the door and we had a settlement at two fifty and I got another 12,500 bucks out of the deal.

. The Fourth District has decided that section 607.07401(3) does not mandate that “a trial court must exercise its own business judgment pursuant to Zapata." Atkins, 874 *996 So.2d at 628. See generally Zapata, 430 A.2d at 789 (holding that the judicial exercise of independent business judgment is "the essential key in striking the balance between legitimate corporate claims as expressed in a derivative stockholder suit and a corporation’s best interests as expressed by an independent investigating committee").
In the present case, we need not reach the question decided in Atkins. For purposes of decision, we assume that the trial court correctly accepted the custodian's "business judgment” that Mr. Smith should be required to account for Unit B-1107’s fair market value.

. Other appraisals ranged as high as $1,400,000.00. At the low end, the custodian obtained two hypothetical, retroactive appraisals in one day and from the same person, one for $730,000.00 and the other for $500,000.00.

. On cross-examination, he testified:
... [H]ad I valued B1107 at something and had that value been $700,000, it could have been more, it could have been less, when it all netted out to what was on the table, the income tax implications, the time[] value [of] money, that kind of stuff, after tax dollars per guy about $40,000 [sic]. That’s where I started and that's where I ended. But even though I'm giving you this hypothetical example, it could have been valued at seven hundred and — That was just one of the many things I thought about, but I didn't write that down. I just knew I[sic] where I was going.